Edward L. WICKER, Sr., Plaintiff,

v.

CONSOLIDATED RAIL
CORPORATION,
Defendant.

James M. Lang, Plaintiff,

v.

Consolidated Rail Corporation,
Defendant.

Donald E. Miller, Plaintiff,

v.

Consolidated Rail Corporation,
Defendant.

Edward L. Wicker, Jr., Plaintiff,

v.

Consolidated Rail Corporation,
Defendant.

Richard Picano, Plaintiff,

v.

Consolidated Rail Corporation,
Defendant.

Walter A. Zolna, Plaintiff,

v.

Consolidated Rail Corporation,
Defendant.

Terry L. Frye, Plaintiff,

v.

Consolidated Rail Corporation,
Defendant.

Randy D. Coho, Plaintiff,

v.

Consolidated Rail Corporation,
Defendant.

Ronald C. Keagy, Plaintiff,

v.

Consolidated Rail Corporation,
Defendant.

Charles E. James, Plaintiff,

v.

Consolidated Rail Corporation,
Defendant.

Ronald Hoover, Plaintiff,

v.

Consolidated Rail Corporation,
Defendant.

James Miller, Plaintiff,

v.

Consolidated Rail Corporation,
Defendant.

Dennis P. Hoover, Plaintiff,

v.

Consolidated Rail Corporation,
Defendant.

John M. Kaltenbrunner, Plaintiff,

v.

Consolidated Rail Corporation,
Defendant.

John A. McCreary, Plaintiff,

v.

Consolidated Rail Corporation,
Defendant.

Gerald M. Williams, Plaintiff,

v.

Consolidated Rail Corporation,
Defendant.

Larry C. Steele, Plaintiff,

v.

Consolidated Rail Corporation,
Defendant.

Charles A. Smouse, Plaintiff,

v.

Consolidated Rail Corporation,
Defendant.

Civil Action Nos. 93–41J, 94–4J, 94–8J,
94–16J, 94–18J, 94–20J, 94–23J, 94–26J,
94–33J, 94–53J, 95–10J, 95–31J, 95–102J,

95–105J, 95–107J, 95–212J, 96–79J, 96–80J.

United States District Court,
W.D. Pennsylvania.

March 24, 2005.

See, also, 142 F.3d 690.

Richard F. Stevens, Esquire, Timothy T. Stevens, Esquire, Paul F. Laughlin, James

M. Flood, Stevens & Johnson, Allentown, PA, George Chada, Workplace Exposure Group, Natrona Heights, PA, Robert J. Beirne, Maureen Beirne, Beirne & Beirne, Athens, PA, for Plaintiffs.

Stephen Houghton, Dickie, McCamey & Chilcote, Pittsburgh, PA, for Defendant.

### MEMORANDUM OPINION and ORDER OF COURT

GIBSON, District Judge.

This matter comes before the Court on the Defendant's Motion *in Limine* (Document No. 24 at C.A. No.1994–4J), Plaintiffs' Motion to Strike Conrail's Motion *in Limine* (Document No. 119 at C.A.No. 1993–41J) and the Defendant's Motion to Enforce Release (Document No. 32 at C.A. No.1994–23J). A general background discussion as to the history of these matters can be found under Section II. A. of this Memorandum. Before proceeding to determine the Motion *in Limine*, the Court will first review the Plaintiffs' Motion to Strike Conrail's Motion *in Limine*.

### I. PLAINTIFFS' MOTION TO STRIKE CONRAIL'S MOTION IN LIMINE

On October 8, 2004, the Plaintiffs (For purposes of Section I, refers collectively to all of the remaining eighteen Plaintiffs identified in the above captions; *see* Section II, *infra*) filed a Motion to Strike Conrail's Motion *in Limine*. The thrust of the Plaintiffs' argument is that the Consolidated Rail Corporation's (Defendant) Motion relies upon the "illegal" research of Dr. James Albers, one of the Defendant's expert witnesses. More specifically, the Plaintiffs allege that Dr. Albers converted the medical information of railroad workers previously examined by him during the course of independent medical examinations unrelated to the instant litigation and used such medical information in medical studies that are supportive of the Defen-

dant's argument that exposure to solvents in railroad work does not result in solvent-induced toxic encephalopathy.

The Plaintiffs produce a letter dated February 12, 2003, Exhibit 7 to their motion, which indicates that the Department of Health and Human Services, Office of Human Research Protections (Department) required the University of Michigan in relation to the Albers research to "submit ... a satisfactory corrective action plan to address the above finding." The letter was written by Dr. Patrick J. McNeilly to Dr. Fawwaz T. Ulaby. The finding the Department refers to is its finding that the University of Michigan Institutional Review Board did not document "four specific criteria when approving waiver or alteration of some or all of the required elements of informed consent." Plaintiffs' Motion to Strike, Exhibit 7. The Plaintiffs provide no further information as to whether the necessary corrective action was taken or if criminal action was taken against Dr. Albers or the University of Michigan. However, the Defendant has provided the Court with a letter dated September 15, 2003 in which the Department noted the "corrective actions" taken by the University of Michigan(UM):

> ... adequately address the determination in OHRP's February 12, 2003 letter and are appropriate under the UM FWA.
>
> (2) OHRP finds that UM has adequately addressed the additional concerns raised in OHRP's February 12, 2003 letter.
>
> As a result of the above determinations, there should be no need for further involvement of OHRP in this matter.

Letter of Dr. McNeilly to Dr. Ulaby, dated September 15, 2003, Exhibit 7 to Conrail's Response (Document No. 79 at C.A. No.1994–4J). This letter references the two published studies of Dr. Albers: "Ab-

sence of Polyneuropathy Among Workers Previously Diagnosed with Solvent–Induced Toxic Encephalopathy, *Journal of Occupational and Environmental Medicine* 41:500–509; 1999" and "Neurologic Evaluation of Workers Previously Diagnosed with Solvent–Induced Toxic Encephalopathy, *Journal of Occupational and Environmental Medicine* 42: 410–423; 2000." *Id.* These are the same studies referenced in the February 12, 2003 letter from Dr. McNeilly to Dr. Ulaby. *Compare* Plaintiffs' Motion to Strike, Exhibit 7 with Defendant's Response, Exhibit 7. Clearly, this informed consent related issue was resolved to the satisfaction of the Department.

The Plaintiffs also suggest that the use of the medical information in question may be in violation of the Health Insurance Portability and Accountability Act of 1996, but do not provide any additional or follow-up actions taken by the government. Such speculation and allegations do not warrant the striking of the Defendant's Motion.

What is more pertinent to the Court's decision on the Plaintiffs' motion is that the two research studies of Dr. Albers that are in question do not play a role in our analysis of the Defendant's Motion *in Limine.* Dr. Albers' opinions play no part in the requirement that the *Plaintiffs* carry the burden established by Federal Rule of Evidence 104 to demonstrate the reliability of their experts. The focus of Defendant's motion is directed at the qualifications and methodology of the *Plaintiffs'* experts, and the Court does not rely in any way upon Dr. Albers' opinions or research in making its analysis of these issues.

Furthermore, the Plaintiffs have not stated in what manner Dr. Albers' research supports the Defendant's current Motion *in Limine.* In addition, Dr. Albers' studies were published in October 1997, June 1999, and April 2000. The present motion was filed on January 16, 1998. Other than the fact that the first article provided to the Court was published by Dr. Albers four months before the Motion *in Limine* was filed, no evidence has been provided that would permit the Court to conclude that Dr. Albers' research played a role in the Defendant's Motion *in Limine.* Further, the Department noted the existence of illegal activity on February 12, 2003 and only then requested corrective action from the University of Michigan, the institutional sponsor, by means of documenting certain criteria for waivers of informed consent. Plaintiffs' Motion to Strike, Exhibit 7. This corrective action only referenced the articles of 1999 and 2000, not the 1997 article. In addition, acceptable corrective action was taken as to the 1999 and 2000 articles. As a result, the Court finds no basis to grant the Plaintiffs' Motion to Strike and it is hereby denied.

The Court will revisit the Plaintiffs' arguments with regard to Dr. Albers in its consideration of the Defendant's Motion to Enforce Release, discussed later in this Memorandum Opinion. For now, we turn to the Defendant's Motion *in Limine.*

## II. DEFENDANT'S MOTION IN LIMINE

This matter comes before the Court on the Defendant's Motion *in Limine* filed January 16, 1998. (Document No. 24 at C.A. No.1994–4J).

### A. Background

These cases have a long and involved procedural history, most of which need not be recounted here. However, for the sake of the reader's understanding as to why these cases have persisted in litigation for twelve years, the Court will briefly explain the process through which these cases presented themselves to this writer.

Twenty-six plaintiffs filed the action found at civil action number 1993–41J, with Mr. Edward L.Wicker, Sr. being the lead plaintiff. Their complaint sought damages against the Defendant under several counts, including negligence and the Federal Employer's Liability Act, 45 U.S.C. §§ 51–60, (FELA) with the Plaintiffs being then-current and former employees of the Defendant who worked at the Hollidaysburg Reclamation Plant, the Hollidaysburg Car Shop and/or the Juniata Locomotive Shop, sites used to salvage locomotives and freight cars and "for the purpose of constructing and repairing locomotives and freight cars...." (Plaintiffs' Complaint, ¶ 15 at C.A. No.1993–41J) respectively. The Plaintiffs claimed medical ailments as a result of alleged exposure to toxic substances including PCBs, diesel fuel, chlorinated solvents, contaminated dust and other hazardous chemicals and substances used in and around the plants as well as disposed onto the enumerated property sites. Although originally comprised of several counts, the Plaintiffs' complaint was reduced to one count alleging injuries under the FELA as a result of the memorandum order of September 24, 1993, signed by then-District Judge D. Brooks Smith. The original cases were later severed by Judge Smith by order dated December 10, 1993 (Document No. 23 at C.A. No.1993–41J). These matters were later consolidated for discovery purposes only under civil action number 1993–41J (*Wicker, Sr. v. Consolidated Rail Corporation*) by order of Judge Smith dated October 3, 1994 (Document No. 26 at C.A. No.1993–41J). Senior Judge John P. Fullam, of the Eastern District of Pennsylvania, was later assigned these cases by Chief Judge Donald E. Ziegler by order dated March 1, 1999. Immediately prior to the entry of this order, Judge Fullam heard three days of testimony concerning the present motion *in limine* on February 2, 3 and 4, 1999.

Judge Fullam attempted to mediate a settlement between the Defendant and the various Plaintiffs prior to addressing the pending motion *in limine*. Several Plaintiffs compromised and settled their claims against the Defendant, but eighteen of these civil actions did not result in a settlement and are currently before this Court for disposition. These outstanding civil actions were transferred to this writer by order of Chief Judge Ambrose dated May 13, 2004.[1] The Court held a status conference on these civil actions on June 30, 2004 to acquaint itself with the outstanding issues related to this litigation, including the need for withdrawal of Plaintiffs' former counsel and the entry of appearance of Plaintiffs' current counsel, Mr. George Chada. Subsequently, the Court scheduled oral argument on the Defendant's Motion *in Limine* and the Defendant's Motion to Enforce Release (Document No. 32 at C.A. No.1994–23J) for October 8, 2004. This oral argument lasted approximately five and one half hours. The Court entertained this lengthy argument in order to achieve a better understanding of the issues involved in the outstanding motions as well as to provide Mr. Chada an opportunity to advocate for the Plaintiffs, in that he had not previously represented the Plaintiffs during the course of the *Daubert* hearing before Judge Fullam in February 1999.

**B. Applicable Law for Daubert Motions Generally**

The Supreme Court recognized in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,

---

1. A nineteenth case, *Walter W. Beckel, Jr. v. Consolidated Rail Corporation,* C.A.No.1994–21J, was transferred to this Court, but subsequently a compromise and settlement was reached.

509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) that Federal Rule of Evidence 702 had superseded the common law standard of "general acceptance" that ·governed the admissibility of expert testimony at trial since the ruling in *Frye v. United States*, 54 App.D.C. 46, 293 F. 1013 (1923). The version of Rule 702 at the time of the *Daubert* ruling read as follows: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 588, 113 S.Ct. 2786, 2794, 125 L.Ed.2d 469, 480 (1993)(citing Federal Rule of Evidence 702). The Supreme Court in *Daubert* concluded that the trial judge should act to screen evidence to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert* at 589, 113 S.Ct. 2786, 2795, 125 L.Ed.2d 469, 480 (1993).[2]

The *Daubert* court then proceeded to analyze Rule 702 as being two separate parts: 1) scientific knowledge (whether the testimony is reliable, *i.e.* based upon "good grounds"); and 2) the ability of the testimony to "assist the trier of fact to understand the evidence or to determine a fact in issue." (whether the testimony is relevant, *i.e.* whether there is a "fit" to use the term utilized by Judge Becker of the Third

Circuit Court of Appeals).[3] *Daubert* at 589–591, 113 S.Ct. 2786, 2795–2796, 125 L.Ed.2d 469, 480–482. Thus, the Supreme Court in *Daubert* requires trial courts to initially determine the validity of the methodology utilized by the expert and then whether the methodology applies to the circumstances in the case at bar. *Daubert* at 592–593, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469, 482.

■  While noting that a *Daubert* inquiry is a "flexible one" and that different factors will be applicable depending upon the circumstances, the Supreme Court set forth five non-exclusive factors that can be used in making this evaluation: 1) can the theory or technique in question be tested; 2) has the theory or technique been subject to peer review and publication;[4] 3) what is the known or potential rate of error for a particular technique; 4) are there standards that exist and are maintained that control the technique's operation; and 5) has the theory or technique been "generally accepted". *Daubert* at 593–594, 113 S.Ct. 2786, 2796–2797, 125 L.Ed.2d 469, 482–483. In addition, the Court specifically recognized that the focus of the inquiry was not to be upon an expert's conclusions: "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595, 113 S.Ct. 2786, 2797, 125 L.Ed.2d 469, 484 (1993). Finally, the Court concluded that expert

---

**2.** The review of Rule 702 in *Daubert* was confined to expert scientific opinion. However, in the case of *Kumho Tire Company, Ltd., et al. v. Carmichael, et al.*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Supreme Court clarified that its *Daubert* analysis of Rule 702 was applicable to all types of expert opinions.

**3.** See *United States v. Downing*, 753 F.2d 1224, (3rd Cir.1985) which is referenced *infra*

in this opinion. Within the *Downing* opinion, the author, Judge Becker, used the term "fit" and this term was adopted by the Supreme Court in its opinion in *Daubert*.

**4.** The *Daubert* Court recognized that publication "is not the *sine qua non* of admissibility." *Daubert* at 593, 509 U.S. 579, 113 S.Ct. 2786, 2797, 125 L.Ed.2d 469, 483.

testimony, which is admissible but "shaky," can be tested by means of "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert* at 596, 113 S.Ct. 2786, 2798, 125 L.Ed.2d 469, 484.

*Daubert* requires that the proponent of expert testimony must prove the testimony as valid and applicable to the facts at issue in the matter by a preponderance of proof, following the requirements of FEDERAL RULE OF EVIDENCE 104(a). *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592–593, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469, 482, n. 10 (1993).

The Third Circuit addressed the standards required of proponents of expert testimony in the case of *In re: Paoli Railroad Yard PCB Litigation,* 35 F.3d 717 (3rd Cir.1994) (*Paoli III*).[5] In that case, the plaintiffs alleged exposure to PCBs that were deposited in the rail yard adjacent to their homes in making claims for medical monitoring and property damage. The version of Federal Rule of Evidence 702 which the Third Circuit reviewed in *Paoli III* differed from the current version of the Rule. The version of Rule 702 at the time of the *Paoli III* litigation was the same as that version evaluated in *Daubert.*

In evaluating the necessary standards for admitting expert testimony at trial the Third Circuit concluded that the 1972 version of Rule 702 had two requirements: 1) a witness offering "specialized knowledge must be an expert"; and 2) "the expert must testify to 'scientific, technical or other specialized knowledge [that] will assist the trier of fact.'" *Paoli III* at 741–742. In discussing the manner of evaluating the Court's first requirement of qualifications, Judge Becker, writing for the Court, found: "Rule 702's liberal policy of admissibility extends to the substantive as well as the formal qualification of experts. We have eschewed imposing overly rigorous requirements of expertise and have been satisfied with more generalized qualifications." *Paoli III* at 741 (citing *Hammond v. International Harvester Co.,* 691 F.2d 646, 652–53 (3rd Cir.1982)).

Addressing the second requirement of "Reliability," Judge Becker noted the Supreme Court's conclusion in *Daubert* that the *Frye* test was not a part of the evaluation of admissibility of expert testimony under Rule 702. *Id.* at 742. Judge Becker then wrote:

> *Daubert* explains that the language of Rule 702 requiring the expert to testify to scientific knowledge means that the expert's opinion must be based on the "methods and procedures of science" rather than on "subjective belief or unsupported speculation"; the expert must have "good grounds" for his or her belief. *Daubert,* 509 U.S. at 589–90, 113 S.Ct. at 2795. In sum, *Daubert* holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity. *Id.* at 590 n. 9, 113 S.Ct. at 2795 n. 9.

---

5. The Third Circuit has had the *Paoli* litigation before it several times and refers to the separate opinions by the names outlined in footnote one of *In re: Paoli R.R. Yard PCB Litigation,* 221 F.3d 449, 455 (3rd Cir.2000) which reads:

> FN1. *See In re: Paoli R.R. Yard PCB Litig.,* 916 F.2d 829 ("*Paoli I*") (3d Cir. 1990); *In re: Paoli R.R. Yard PCB Litig.,* 980 F.2d 724 ("*Paoli II*") (3d Cir.1992); *In re: Paoli R.R. Yard PCB Litig.,* 35 F.3d 717 (3d Cir.1994) ("*Paoli III*"); *In re: Paoli R.R. Yard PCB Litig.,* 113 F.3d 444 (3d Cir.1997) ("*Paoli IV*"). For a more thorough discussion of the underlying facts and legal issues in this case, see Paoli I, III, and IV.

The Court will therefore refer to these opinions according to their designations set forth in this footnote.

*Paoli III,* 35 F.3d 717, 742 (3rd Cir.1994). The five factors set forth by the Supreme Court in *Daubert,* are to be used in the evaluation of the reliability of an expert's methods. The five factors of *Daubert* were noted by Judge Becker to be similar to those factors utilized in the Third Circuit opinion in *U.S. v. Downing,* 753 F.2d 1224, 1238–1239 (3rd Cir.1985). However, three factors of *Downing* were not included within the *Daubert* factors: "the degree to which the expert testifying is qualified, the relationship of a technique to 'more established modes of scientific analysis,' and the 'non-judicial uses to which the scientific technique are put.'" *Paoli III* at 742 (citing *Downing,* 753 F.2d 1224, 1238–39 (3rd Cir.1985)). The Supreme Court in *Daubert* did not foreclose such use of other factors in evaluating the reliability of expert testimony, *Daubert,* 509 U.S. 579, 594, 113 S.Ct. 2786, 2797, 125 L.Ed.2d 469, 484, n. 12, and *Paoli III* instructs the district courts of the Third Circuit to consider all of the factors listed by *Daubert and Downing* as listed in footnote eight of *Paoli III. Paoli III* at 742. Footnote eight of *Paoli III* reads as follows:

> Thus, the factors *Daubert* and *Downing* have already deemed important include: (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

In conducting a *Daubert* analysis a district court must also consider the requirement of "fit." Judge Becker succinctly describes "fit" as follows:

> In addition to reliability, Rule 702 requires that the expert's testimony must assist the trier of fact. As we put it in *Downing,* admissibility depends in part on "the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case." *Downing,* 753 F.2d at 1237. *See Daubert,* 509 U.S. at 589–93, 113 S.Ct. at 2795–96, 125 L.Ed.2d 469 (explicitly adopting the "fit" requirement of *Downing* ). For example, animal studies may be methodologically acceptable to show that chemical X increases the risk of cancer in animals, but they may not be methodologically acceptable to show that chemical X increases the risk of cancer in humans. *Daubert* explains that, " '[f]it' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Id.* at 591, 113 S.Ct. at 2796. Thus, even if an expert's proposed testimony constitutes scientific knowledge, his or her testimony will be excluded if it is not scientific knowledge for purposes of the case. "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* (emphasis added). For example, in order for animal studies to be admissible to prove causation in humans, there must be good grounds to extrapolate from animals to humans, just as the methodology of the studies must constitute good grounds to reach conclusions about the animals themselves. Thus, the requirement of reliability, or "good grounds," extends to each step in an expert's analysis all the way through the step that connects the work of the expert to the particular case.

*Paoli III*, 35 F.3d 717, 742–743 (3rd Cir. 1994). The Third Circuit emphasized that the question of reliability, discussed *infra*, bears upon the "fit" component of the analysis by finding that the standard for fitness is "not that high" but is "higher than bare relevance." *Paoli III* at 745. The court noted in, *In re: Paoli R.R. Yard PCB Litig.*, 916 F.2d 829 (3rd Cir.1990) (*Paoli I* ) that testimony that PCBs cause liver cancer was admissible even though no plaintiff suffered from such cancer because an affidavit supported the notion that "increased risk of liver cancer was probative of increased risk of other forms of cancer." *Id.*

The *Paoli III* Court went on to recognize that in assessing the admissibility of expert opinion under Federal Rule of Evidence 702, in accordance with Federal Rule of Evidence 104(a), the proponent of the testimony "must make out more than a *prima facie* case of reliability." *Paoli III* at 744, n. 9. This pre-trial inquiry is to establish compliance with Rule 702, specifically to establish that the opinions to be given at trial are reliable. *Paoli III* at 744. "The evidentiary requirement of reliability is lower than the merits standard of correctness." *Id.* Further, the *Paoli III* Court found that a court may determine that "good grounds" exist for the expert opinion to be offered, even though the judge may believe "better grounds" exist for an alternate conclusion or that a somewhat flawed methodology, if fixed, would lead to a different conclusion. *Paoli III* at 744. "A judge frequently should find an expert's methodology helpful even when the judge thinks that the expert's technique has flaws sufficient to render the conclusions inaccurate." *Paoli III* at 744–745. The Third Circuit also found that the distinction between a methodology and the manner of its application is not warranted by concluding:

As suggested, *Daubert* inters any need for us to make such a distinction, for *Daubert's* requirement that the expert testify to scientific knowledge—conclusions supported by good grounds for each step in the analysis—means that any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology.[14]

---

[14] Of course, if a court finds that an expert has employed a methodology only slightly different from a methodology that the court thinks is clearly reliable, the court should be more likely to accept the altered methodology than if it was evaluating that methodology as an original matter.

*Paoli III*, 35 F.3d, 717, 745 (3rd Cir.1994). The Court also recognized that when a district court, after focusing on the methodology of an expert under a *Daubert* analysis, subsequently disagrees with the expert's conclusion, the judge will most likely be in disagreement not because of the conclusion made, but, because of a mistake in the questioned method or the superiority of another method over the questioned method. *Paoli III* at 746. However, a flaw in methodology does not automatically disqualify an expert opinion; the flaw must be of such substance to create a lack of "good grounds" for the expert's conclusions. *Paoli III*, at 746.

C. *Analysis on Plaintiffs' Failure to Meet Initial Burden of Proof*

The Court notes the complexity of this matter and observes that Judge Fullam conducted a lengthy *Daubert* hearing on February 2, 3 and 4, 1999. The Third Circuit has required *Daubert* hearings in such circumstances. *See e.g., Padillas v. Stork–Gamco, Inc.*, 186 F.3d 412 (3rd Cir.1999)(finding complexity as a reason for a court to require a *Daubert* hearing

without a request from any party). The Court notes that during the hearing, the movant, the Defendant, was the only party to produce any witnesses while the Plaintiffs, the proponents of the challenged testimony, sought only to conduct cross-examination of the Defendant's witnesses without offering testimony of their own. The Plaintiffs offered only documentary evidence into the record: "MR. LAUGHLIN: On behalf of the plaintiffs, we will not be calling any live testimony in this proceeding. However, we have a number of documents which we wish to move into evidence." Hearing Transcript of February 4, 1999 (Document No. 67)(hereinafter "HT"), p. 112.

This procedure followed during the hearing appears to be contrary to the standard established in *Daubert* and *Paoli III* requiring that the proponent of the challenged evidence must meet the burden of demonstrating admissibility by a preponderance of the evidence. *See id.* at 417–418; *Paoli III*, 35 F.3d 717, 743 n. 9, 744 (3rd Cir.1994). However, in spite of this apparent procedural lapse, this Court will evaluate the Defendant's motion in accordance with the previously stated burden of proof and will do so by considering all of the evidence submitted by the Plaintiffs in relation to the Motion *in Limine*, the transcript of the *Daubert* proceedings of February 1999 and all of the evidence submitted by the Defendant in relation to the Motion *in Limine*. After a review of the hearing transcripts, the Court finds that the Plaintiffs were provided the opportunity to submit their challenged experts for

examination along with any other evidence they wished to present; the reason for the apparent procedural misstep of the party with the burden of proof failing to offer affirmative testimony is unclear in that it was a circumstance not commented upon by counsel or the Court at the time.

Nevertheless, the Plaintiffs, through their various counsel, have taken advantage of the opportunities to submit ample evidence upon the record in support of their proposed experts to allow the Court to conclude that prior to these matters being transferred to this writer, that the rule of law requiring the Plaintiffs to step forward first in the procedural sequence and proffer evidence in support of their proposed experts has been in a sense "substantially" met by the numerous submissions of information and argument in this matter. Therefore, the Court conducts the following analysis of the *Daubert* issues with an awareness of the requirement that the Plaintiffs, as proponents of the challenged evidence, must initially offer evidence in support of their expert witnesses.[6]

### D. Analysis on the Applicability of the Daubert and Paoli III Holdings to FELA Actions

██ One further issue must be addressed briefly before proceeding to the analysis of *Daubert* issues. This issue concerns the interplay and effect of the FELA upon the question of admissibility of expert opinion under *Daubert* and *Paoli III*. The Third Circuit, in a pre-*Daubert* case of *Hines v. Consolidated Rail Corporation*,

---

**6.** After a review of the *Daubert* transcript, it appears that two defense objections existed that were not ruled upon by Judge Fullam. HT of February 4, 1999, pp. 119, 122. They are objections to the admission of the report by ENSR, Exhibit P–41 and the affidavit of Dr. Ellenbecker, Exhibit P–42. The objections are ruled upon as follows: the objection to the ENSR report is sustained as it is without accompanying explanation by an expert witness, and therefore incomprehensible to the Court; while the objection to the affidavit of Dr. Ellenbecker is moot as he has been withdrawn as a witness by the Plaintiffs. *See, infra*, p. 715.

926 F.2d 262, 269 (3rd Cir.1991), concluded that the FELA standard can affect the decision to admit expert testimony. The *Hines* court resolved most of the issues before it consistent with its rulings in the related case of *Paoli I* principally because of the fact that the district court, which presided over both cases, did not provide an opinion explaining its exclusion of the Plaintiff's expert, Harry Shubin, M.D., who conducted what appeared to be a differential diagnosis. *Hines* was decided in the context of a summary judgment motion.

In *Paoli III,* the Third Circuit, having the benefit of the guidance of the Supreme Court in *Daubert,* again indicated that in "analyzing reliability for the purposes of litigation not for the purposes of science, the substantive standard of causation can affect the standard of admissibility." *Paoli III,* 35 F.3d 717, 761 n. 31 (3rd Cir.1994). The Third Circuit went on in that footnote to conclude that the Pennsylvania state law standard of the "substantial factor" in a negligence action did not affect the issue of admissibility in that case because the cases applying the "substantial factor" standard are mostly found in the medical malpractice context with one exception which did not explain why that standard was applied. The Third Circuit concluded: "We do not think that this latter case articulates the law in Pennsylvania, and we thus think that Pennsylvania substantive law does not change the federal standard for the admissibility of expert testimony." *Id. Paoli III* was also decided in the context of a summary judgment motion challenging expert testimony, where the cause of action concerned the state law claim of medical monitoring and the issue concerned how the Plaintiffs' expert testimony, based upon the methodology of differential diagnosis, supported this claim.

In a matter related to the cases *sub judice, Snyder v. Consolidated Rail Cor-* *poration,* C.A. No.1994–11J, then-District Judge D. Brooks Smith decided a motion *in limine* as to John J. Shane, M.D. wherein he had to apply both *Paoli III* and *Hines.* In the unpublished opinion of *Snyder v. Consolidated Rail Corporation,* No. C.A. 94–11J, 1998 WL 465897, at *6 (W.D.Pa. Aug.4, 1998), the court concluded that "as long as [a] plaintiff's expert presents scientifically reliable evidence that the toxic exposure could have played some role, however small, in causing plaintiff's injuries, the testimony should be admitted under *Hines*" but "if the expert's conclusion—or any inferential link that undergirds it—fails under *Daubert* to provide *any* evidence of causation, it must be excluded, even under *Hines* liberal approach to admissibility." (emphasis in original).

The Third Circuit has yet to elaborate upon footnote thirty-one in *Paoli III* as to the circumstances under which the substantive law affects the issue of admissibility. Judge Kelly, the presiding judge of the *Paoli* litigation, has recently found, in an unpublished opinion, that the FELA causation standard does not affect the burden of admissibility of a plaintiff's expert witnesses. *In re Paoli Railroad Yard PCB Litigation,* Nos. CIV.A. 86–2229, 87–1190, 87–1258, 87–3227, 2000 WL 274262 (E.D.Pa. March 7, 2000). Judge Kelly's approach is consistent with the Ninth Circuit's case of *Claar v. Burlington Northern R. Co.* 29 F.3d 499, 503 (9th Cir.1994) which found: "The standard of causation under FELA and the standards for admission of expert testimony under the Federal Rules of Evidence are distinct issues and do not affect one another." In *Claar,* a FELA action, the Ninth Circuit was reviewing the granting of summary judgment and the court upheld summary judgment finding a lack of causation evidence presented by the plaintiff's expert witnesses, and thus no genuine issue of mate-

rial fact on the element of causation. *Claar* at 504.

In consideration of the uncertainty of the Third Circuit's message in footnote thirty-one of *Paoli III,* and a lack of subsequent precedent in the Third Circuit concerning the interplay between the FELA and the admissibility of expert testimony under Federal Rule of Evidence 702, *Daubert,* and its progeny, the Court will analyze the Defendant's motion *in limine* consistent with the *Claar* approach. The Court does this for three reasons.

First, all of the precedent and cases cited above have determined admissibility in the context of motions for summary judgment and not motions *in limine.* Summary judgment is obviously connected to the proving of a *prima facie* case and in a FELA case, causation is one such element of the employer's negligence. It is the Court's view, consistent with *Claar,* that the Plaintiffs' expert testimony could result in opinions that do not establish causation, but are still reliable, fit and helpful for the jury to understand the issues. Thus, an opinion could meet a *Daubert* challenge as to reliability and fit by applying the proper methods to scientific questions, but not advance the Plaintiffs' cause of action because it is equivocal in its conclusions. Therefore, in this opinion, the Court is only determining the questions required by Federal Rule of Evidence 702 and *Daubert* and not any questions under Federal Rule of Civil Procedure 56. The Court notes that the Defendant has proposed summary judgment also, but that motion will be addressed separately later in our opinion. If the two issues were combined, the Court would proceed to questions of causation and a possible finding of summary judgment. However, that circumstance is not before the Court, and therefore only the issue of whether the experts offered by Plaintiffs will be permitted to offer expert opinions will be considered, not their role in proving causation under FELA.

Second, the Court notes the following passage from *Hines:*

> Conrail also argues that, in contrast to *Paoli,* Hines did not make a claim for medical monitoring and therefore the "decreased burden of proof apparently applied by the *Paoli* decision based on medical monitoring has no claim here." Letter Brief for Appellees (General Electric) at 3. However, in *Paoli,* we treated our decision regarding the medical monitoring claim, together with what we characterized to be other "discrete" or "distinct" legal issues, separate and apart from our decision regarding the admissibility of evidence under Fed. R.Evid. 702, 703, and 403. *Paoli,* 916 F.2d at 836, 861. *Conrail is incorrect, then, in concluding that our decision on the medical monitoring issue in any way affected, either substantively or in terms of burden of proof, our decision regarding the admissibility of the testimony of other experts.*

*Hines v. Consolidated Rail Corporation,* 926 F.2d 262, 276 (3rd Cir.1991) (emphasis added).

Third, the *Paoli* litigation, *Hines* and *Snyder* all dealt with expert witness testimony that was based upon differential diagnosis. The admissibility of this type of diagnosis will be reviewed further, later in the opinion. Nonetheless, it is sufficient to say at this point that differential diagnosis relies upon the evaluation of separate possible causes of a physical condition, and the arrival at a diagnosis through the narrowing down of these causes commonly through use of medical exams and testing, taking of medical histories, and review of relevant literature on possible diagnoses, as well as other techniques sometimes

unique to the symptoms and circumstances. *See Paoli III, infra.* Therefore, differential diagnosis, as an expert methodology, uniquely relies upon the question of causation in its application. That is why in *Paoli III* the Third Circuit required an expert applying differential diagnosis to explain why he did not find a specific alternative cause when challenged to do so by the opposing party; failure to reasonably explain why a conclusion of such alternative cause was not reached would therefore result in a finding of unreliability. *Paoli III*, 35 F.3d 717, 759, n. 27, 760 (3rd Cir.1994).

Therefore, the following analysis of the Defendant's Motion *in Limine* is based upon Federal Rule of Evidence 702, *Daubert* and its progeny, and *Paoli* and its progeny without any question of admissibility being affected by the standards of causation set forth under the FELA. Such questions of causation are properly suited for analysis pursuant to a challenge to the adequacy of the *prima facie* elements of a theory of liability under the rubric of a Federal Rule of Civil Procedure 56 summary judgment motion.

### E. Analysis on the Reliability of Plaintiffs' Expert Witnesses

Plaintiffs' counsel at oral argument on this matter on October 8, 2004 indicated that he would not present any testimony from the experts being challenged by the Defendant in its Motion *in Limine*. Argument Transcript (hereinafter "AT"), pp. 2–14. However, Plaintiffs' counsel did indicate that he intends to present, at the time of trial, the treating physicians of each Plaintiff who may or may not rely upon the reports produced by these experts being challenged in the Motion *in Limine* as part of the treating physicians' technique of differential diagnosis performed upon the Plaintiffs. *Id.*

The Court proceeded with argument on the Motion *in Limine* as it was apparent that Plaintiffs' counsel was not going to agree to the preclusion of the Plaintiffs' experts and that the Plaintiffs may rely upon these expert reports at some point in the future. AT, pp. 11, 6.

The Court does not pass judgment upon the issue of whether differential diagnoses of the Plaintiffs' treating physicians are admissible or whether the Plaintiffs require the testimony of expert witnesses to prove their causes of action under FELA. Even so, the Court recognizes that the Plaintiffs' counsel is correct that differential diagnosis is an acceptable methodology under Rule 702 (*See Paoli III*, 35 F.3d 717, 758–759 (3rd Cir.1994)), but also recognizes that the time for expert discovery and designation of experts has long since passed in these eighteen civil actions before the Court. Amended Case Management Order, dated January 29, 1997(Document No. 10 at 94–4J)(ordering fact discovery to be completed by June 30, 1997 and designation of Plaintiffs' expert witnesses and their reports by July 31, 1997); AT, p. 8. These issues are not before the Court, but may in the future need to be decided and those decisions may at that time be dependent to some degree upon the expert reports at issue today. Therefore, the Court will proceed with its analysis of the Defendant's Motion *in Limine*.

Before proceeding with the analysis of each individual expert under the motion *in limine*, the Court notes that at oral argument on this motion Plaintiffs' counsel indicated that he would not rely upon the opinions of Dr. Ellenbecker or Dr. Perovich and the motion *in limine* is unopposed as to these experts. AT, pp. 41–42, 76–77. Therefore, the Defendant's Motion *in Limine* is granted as to Dr. Ellenbecker and Dr. Perovich. The Court will now

proceed to the analysis of the first expert witness under the Defendant's Motion *in Limine.*

### 1. Dr. Melvyn J. Kopstein

**Findings of Fact**

Dr. Kopstein has a Ph.D. in chemical engineering from the University of Pennsylvania and has worked in this field as either an researcher, analyst, or consultant, including consulting for government and litigants, for the past thirty years. Kopstein Aff. ¶¶ 2–4.

Dr. Kopstein admits that his analysis does not attempt to measure the ambient air levels of chemicals in the air brake shop, garage or any other location within the Defendant's facilities. Kopstein Aff. (Document No. 43 at C.A. No.1994–4J) ¶ 18; Kopstein Depo. (Document No. 27, Exhibit 2, at C.A. No.1994–4J) pp. 28–29. Dr. Kopstein's analysis uses the Unsteady State Diffusion Model (Model), from the textbook *Transport of Phenomena* authored by Bird, Stewart & Lightfoot. Kopstein Depo. pp. 28–29; Kopstein Aff. ¶ 5. Dr. Kopstein uses the Model to estimate the concentration of Trichloroethylene, (TCE) Trichloroethane (TCA) and Benzene exposure for those Plaintiffs who had worked in job titles utilizing these chemicals either in the air brake shop or the garage. Kopstein Aff. ¶¶ 20–21. Dr. Kopstein uses this model only to analyze the concentrations of TCE, TCA and Benzene. Kopstein Depo. pp. 133, 135. Kopstein Report (Document No. 40, Exhibit No. 9).

Dr. Kopstein does not attempt to opine on the issue of causation, but only on the "opportunities for exposure." Kopstein Aff. ¶¶ 12, 23–24. Information regarding the measurement of ambient air levels of TCE, TCA, Benzene and other chemicals at issue during the time periods relevant to this suit have not been discovered.

Kopstein Depo. p. 138. It is unknown whether any such tests were conducted at the times material to the allegations found in the Plaintiffs' complaints. *Id.* Dr. Kopstein employed an analysis that did not take into account air currents within the working space of the Plaintiffs for which he evaluated exposure. Kopstein Depo. pp. 166–167.

**Kopstein Analysis**

The Court notes that the qualifications of Dr. Kopstein have been challenged by the Defendant to the extent that the Defendant argues that Dr. Kopstein cannot give an opinion as to the causation of any condition or illness of any Plaintiff. Defendant's Brief, p. 23. The Court agrees with the Defendant that Dr. Kopstein cannot opine as to causation of the Plaintiffs' conditions or illnesses. The Plaintiffs have previously agreed to this point as well: Plaintiffs' former counsel indicated that Dr. Kopstein was to put forth an opinion as to "dose and opportunity for exposure, *not effect!*" Plaintiff's Response, p. 27. Therefore, the Court concludes that Dr. Kopstein cannot opine as to the causation of any of the Plaintiffs' physical or mental conditions or ailments as he is not qualified to do so. Nonetheless, as to the initial question of qualifications, the Court recognizes that Dr. Kopstein holds a Ph.D. in chemical engineering from the University of Pennsylvania, has conducted research and analysis professionally since 1974 for private corporations and government agencies such as Exxon, TRW Energy Systems, and the EPA and DOE to name a few examples. Kopstein Aff. ¶¶ 2–4. Dr. Kopstein also brings to the Court's attention that he has been providing forensic chemical engineering for attorneys since 1987. *Id.* He is clearly qualified to speak on matters of chemical engineering.

Our second inquiry under *Daubert* and the Third Circuit's *Paoli III* analysis is to review the reliability of the methods used by Dr. Kopstein. Defendant has challenged both reliability and fit in its motion *in limine.* Defendant's Brief, p. 29. Before proceeding with our analysis, the Court must conclude at this point that Dr. Kopstein's opinions with regard to chemical opportunities for exposure for those substances other than TCE and TCA and Benzene are unreliable. Dr. Kopstein has employed a Model discussed herein with regard to calculating exposure as to these three chemicals by the Plaintiffs. However, a review of Dr. Kopstein's conclusory analysis of exposures in his report, deposition and affidavit to other substances cannot be permitted at trial as expert testimony. This is because such conclusions are not expert testimony in themselves.

Dr. Kopstein obtained various information indicating that certain substances, such as PCBs, were present at Plaintiffs' workplace and the Plaintiffs were exposed to substances, such as in the case where the color of the paint being used by some workers was found in their mucus. Such observations do not require "scientific, technical, or other specialized knowledge" to be introduced into the record at trial. FED.R.EVID. 702. Therefore, the Court will not place the label of "expert testimony" upon such observations. These items of information which do not fall within the ambit of expert testimony do not include Dr. Kopstein's conclusion about the dumping or spreading of various wastes by the slop truck where he concluded that 1,000 tons per week were dumped or spread.[7] Kopstein Report, p. 2. Such a calculation appears to be reliable and fit without need

for further discussion. The Court will proceed with its remaining *Daubert* analysis as to Dr. Kopstein's opinions concerning TCE, TCA, and Benzene.

Our review of Dr. Kopstein's remaining opinions reveals his methodology to be reliable. The Court's review of the Defendant's position, while framed as an argument regarding the reliability and fit of Dr. Kopstein's methodology is, in essence, a challenge to the fit of his methodology as to the question of causation of the Plaintiffs' conditions and illnesses. *Paoli III* instructs the district courts of the Third Circuit to conduct an evaluation of eight factors that can help determine a method's reliability while considering other relevant factors as well. *Paoli III,* 35 F.3d 717, 742 (3rd Cir.1994).

Applying the eight factors listed earlier in this opinion, the Court makes the following conclusions regarding Dr. Kopstein's method: the diffusion method employed here has been tested, peer reviewed and used consistently in the field of chemistry so as to be reliable, and is not in error. This Model is recognized as generally accepted in the chemical engineering community for determining the rate of diffusivity. Dr. Kopstein has applied the needed variables to the Model used to calculate the diffusivity of TCE, TCA and Benzene (based on an average of 3% concentration in gasoline). Although not necessarily a technique, but more of a standard proven formula that is clearly reliable, the Model is used by chemists outside of litigation in the field of chemistry and by qualified chemical engineers such as Dr. Kopstein.

It is clear to the Court that the use of the Model by Dr. Kopstein is a reliable

---

7. Dr. Kopstein performed a calculation of volume multiplied by density to arrive at his conclusions. Kopstein Depo. P. 196. Densities of materials can be judicially noticed, but it is the opinion of the Court that the remaining arithmetic may not be within the ordinary realm of a reasonable juror.

methodology. Dr. Kopstein inserted the variables necessary to utilize the Model and make his calculations. Kopstein Depo. pp. 20–38. This Model is common to the field of chemical engineering and not created by Dr. Kopstein just for the purposes of this litigation. Kopstein Depo. pp. 20–21; Kopstein Aff. ¶ 5. No other extraneous considerations appear to bear any relevance to our reliability inquiry. Therefore, the Court finds that the Plaintiffs have proven by a preponderance of the evidence that Dr. Kopstein's opinions are reliable.

■ The final and most challenging inquiry for this Court is the question of whether Dr. Kopstein's reliable opinions are fit for the task of proving the Plaintiffs' theories of liability against the Defendant. As discussed above, using the analysis from the hallmark case of *Paoli III*, fit is a question of more than "bare relevance" but "must itself constitute scientific knowledge." *Paoli III*, 35 F.3d 717, 745, n. 13 (3rd Cir.1994). The Third Circuit in *Paoli III* used the example of a methodologically acceptable animal study demonstrating that a chemical increases a cancer risk in animals but which may or may not be methodologically acceptable to demonstrate such a link to increased cancer risks in humans. *Paoli III* at 742–743. The question is not whether the proposed testimony is scientific knowledge, but rather whether it is relevant scientific knowledge for the purposes of the case before the Court; the proposed testimony must have a "valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Paoli III* at 743. The *Paoli III* court concluded that within its example there must be "good grounds" for the methodology to make conclusions as to the chemical effect upon animals as well as good grounds for the animals studies to be able to be extrapolated from the animals to

humans; " 'good grounds' extends to each step in an expert's analysis all the way through the step that connects the work of the expert to the particular case." *Paoli III* at 743.

The Court has already concluded that Dr. Kopstein is not offering testimony as to causation, only "opportunities for exposure." Considering the information presented by Dr. Kopstein and the finding that his opinion speaks to exposure, not the effect thereof, it is apparent that the question of fit of Dr. Kopstein's opinion is one of fit to the first element of the seven steps outlined by Raymond D. Harbison, Ph.D., in his affidavit which are the scientifically accepted method of "causation analysis" of "chemically-induced disease". Harbison Aff. (Document No. 26 at C.A. No.1994–4J) ¶ 56. These seven factors must be evaluated before causation of a chemically induced disease can be proven:

1) is there evidence of exposure;

2) does the exposure result in a dose;

3) is the dose sufficient to cause the specific ailment or disease;

4) is that specific disease or ailment known to be caused in humans by the chemical;

5) that the specific disease or ailment is temporally eligible to have been caused by the chemical exposure;

6) is the alleged effect biologically plausible; and

7) have confounding factors been eliminated as the possible cause of the disease or ailment?

*Id.* One of the Defendant's arguments against Dr. Kopstein is the fact that, according to its expert, Dr. Harbison, there is no objective information, such as air monitoring or industrial hygiene data, that exists to confirm the exposures the Plaintiffs are alleging and attempting to prove, in part, through Dr. Kopstein's testimony.

The REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (2d ed.2000) recognizes three means of measuring exposure of chemicals to human beings:

> Evidence of exposure is essential in determining the effects of harmful substances. Basically, potential human exposure is measured in one of three ways. First, when direct measurements cannot be made, exposure can be measured by mathematical modeling, in which one uses a variety of physical factors to estimate the transport of the pollutant from the source to the receptor. For example, mathematical models take into account such factors as wind variations to allow calculation of the transport of radioactive iodine from a federal atomic research facility to nearby residential areas. Second, exposure can be directly measured in the medium in question—air, water, food, or soil. When the medium of exposure is water, soil, or air, hydrologists or meteorologists may be called upon to contribute their expertise to measuring exposure. The third approach directly measures human receptors through some form of biological monitoring, such as blood tests to determine blood lead levels or urinalyses to check for a urinary metabolite, which shows pollutant exposure. Ideally, both environmental testing and biological monitoring are performed; *however, this is not always possible, particularly in instances of past exposure.*

REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, p. 424 (2d ed.2000) (emphasis added).

Discovery has been complete in this matter for over seven years and despite the numerous requests of current Plaintiffs' counsel, the Court is loathe to open discovery again for a matter that has been ongoing for twelve years and which has had the subject motion under review for seven years. Had previous discovery uncovered real-time monitoring of the working conditions of the Plaintiffs during the periods of time relevant to their complaints, such evidence would be invaluable to the evaluation of all parties' cases and would have given everyone, including the Court, a better understanding of the scientific evidence being proffered to it. The Court could agree with the Plaintiffs and re-open discovery for another period of time and essentially start this matter over again to determine the existence, if any, of industrial and medical monitoring conducted by the Defendant upon the Plaintiffs' workplace and persons. Such a decision could conceivably provide to the Court a more complete picture in dealing with the analysis herein if such information rested in the Defendant's possession. However, former Plaintiffs' counsel chose a particular manner of proving these cases and it is not appropriate to re-open discovery more than seven years after it had been closed, and in effect start over again on cases which were filed more than ten years ago.

Dr. Kopstein has presented evidence of "opportunities for exposure." His methodology and resulting calculations speak to the first element of "causation analysis". The Court has already concluded that good grounds exist for the reliability of those conclusions. The next issue is whether good grounds exist for the conclusions of Dr. Kopstein to be used in the overall causation analysis to be presented in the Plaintiffs' cases. Dr. Kopstein's testimony provides some assistance in painting a picture of the exposure alleged to have been suffered by the Plaintiffs in this case, but provides only a few brush strokes in the overall painting of that picture of exposure.

The Defendant points out several considerations, including the presence of any air currents, that are not measured by Dr.

Kopstein's calculations. Dr. Kopstein has noted that such information was not part of his Model. In addition, Dr. Kopstein has also noted that his use of the Model is more or less equivalent to an expert testifying to a hypothetical situation. Indeed, hypothesis is the only basis upon which an expert can opine in this instance in the absence of hard evidence of exposure.

The Third Circuit has previously recognized that hard evidence of the level of exposure is unnecessary for a medical expert to opine that exposure to· a chemical caused a plaintiff's illness. In both *Heller v. Shaw Industries, Inc.,* 167 F.3d 146, 157–158 (3rd Cir.1999) and *Kannankeril v. Terminix International, Inc.,* 128 F.3d 802, 808–809 (3rd Cir.1997) the Third Circuit, in the context of civil actions ·where the plaintiffs were proffering expert medical testimony based upon differential diagnosis, found that the types of evidence used in supporting a theory of exposure of a plaintiff to a chemical is a question of credibility, not admissibility. Specifically in *Kannankeril,* the Third Circuit wrote:

> We find that Terminix's assertion is without merit. First, there is no expert opinion in the record to establish that an ambient air test, particularly an ambient air test performed nine months after the final application of Dursban, is the only appropriate way in this case to gauge exposure to the organophosphate. Moreover, the plaintiffs were prepared to offer into evidence the Dursban product label which contained warnings such as: "HARMFUL IF SWALLOWED. HARMFUL IF ABSORBED THROUGH SKIN. CAUSES EYE AND SKIN IRRITATION" and "Thoroughly wash dishes and food handling utensils with soap and water if they become contaminated by application of this product. Do not allow children or pets to contact treated surfaces until spray has dried." App. at 241–43. Under the facts as presented in this case, the district judge erred in ruling that an expert may rely only on the ambient air test to determine whether Dr. Kannankeril had been exposed to Dursban. Instead, all factual evidence of the presence of the .chemicals in the residence should be relevant in forming an expert opinion of causation.

> We conclude that it is for the trier of fact to determine what weight to give the ambient air test results as an indication of exposure. *See Joiner v. General Elec. Co.,* 78 F.3d 524, 534 (11th Cir. 1996) (reversing exclusion of expert opinions that plaintiffs' exposure to certain chemicals caused his lung cancer where there were issues of fact whether plaintiff was actually exposed to the chemicals so that summary judgment based on a finding of no exposure was inappropriate). The issue whether an ambient air test should be given more weight than pesticide application records goes to the weight rather than the admissibility of evidence. *See United States v. Velasquez,* 64 F.3d 844, 848 (3d Cir.1995) (citing *United States v. Jakobetz,* 955 F.2d 786, 800 (2d Cir.1992)). The trial judge must be careful not to mistake credibility questions for admissibility questions.

*Kannankeril* at 808–809. The Court does not intend to make such a credibility determination in the cases *sub judice.* Dr. Kopstein's use of the Model clearly does not consider the movement of air within the air brake shop or the garage. This is a point the Defendant can certainly reveal to the jury through cross-examination at trial and the Plaintiffs would then have to explain in turn. The lack of consideration of all of the working conditions confronted by the Plaintiffs would present a difficulty for a jury to accord credibility to the Plaintiffs' expert. If the Plaintiffs wish to pres-

ent only half of the exposure picture, such is their choice and the jury would have to assess these factors at the time of trial. As stated in *Paoli III*, "A judge frequently should find an expert's methodology helpful even when the judge thinks that the expert's technique has flaws sufficient to render the conclusions inaccurate." *Paoli III* at 744–745.

A more powerful argument is that the Plaintiffs have failed to establish Dr. Kopstein's testimony as fit because of the fact that the concentrations that he has opined were present would have allegedly resulted in explosions, loss of consciousness, diseases and death. *See e.g.* Harbison Aff. pp. 28–29. This raises an issue the Third Circuit addressed in *Heller, supra.*

In *Heller*, the plaintiffs were attempting to prove causation for their physical injuries based upon the emission of volatile organic compounds from household carpet. The plaintiffs attempted to prove this causation through use of a temporal relationship argument. On appeal, the Third Circuit concluded that: "While the district court may not reject an expert's conclusion simply because the court finds it wanting, it is surely within the court's province to ensure that the conclusion, particularly a medical expert's ultimate conclusion on causation, 'fits' with the data alleged to support it." *Heller v. Shaw Industries, Inc.*, 167 F.3d 146, 158 (3rd Cir.1999) (citation omitted). For that conclusion, the *Heller* court relied upon the reasoning found in *Paoli III*, where the Third Circuit made the following observation:

> Plaintiffs are correct, of course, that Daubert requires the judge's admissibility decision to focus not on the expert's conclusions but on his or her principles and methodology. *See Daubert*, 509 U.S. at 593–95, 113 S.Ct. at 2797. But we think that this distinction has only limited practical import. When a judge

disagrees with the conclusions of an expert, it will generally be because he or she thinks that there is a mistake at some step in the investigative or reasoning process of that expert. If the judge thinks that the conclusions of some other expert are correct, it will likely be because the judge thinks that the methodology and reasoning process of the other expert are superior to those of the first expert. This is especially true given that the expert's view that a particular conclusion "fits" a particular case must itself constitute scientific knowledge—a challenge to "fit" is very close to a challenge to the expert's ultimate conclusion about the particular case, and yet it is part of the judge's admissibility calculus under *Daubert.*

*Paoli III*, 35 F.3d 717, 746 (3rd Cir.1994)(footnote omitted). This appears to be the same type of argument used by the Defendant in the cases *sub judice* to attempt to prove the methodology of Dr. Kopstein incorrect.

Dr. Kopstein defends his conclusions in paragraph forty of his affidavit which reads:

> I never wrote, implied, or testified that workers at Conrail's Hollidaysburg facility *routinely* breathed air that contained benzene, trichloroethylene, or trichloroethane in the concentrations discussed in the Motion. Furthermore, I never wrote, implied, or testified that workers at Conrail's Hollidaysburg facility breathed air that contained benzene, trichloroethylene, or trichloroethane in the concentrations discussed in the Motion for *more than a very brief instant.* What I did convey in my report and deposition testimony is that the workers routinely breathed air that contained concentrations of benzene, trichloroethylene and trichloroethane that exceeded OSHA limits.

Dr. Kopstein thereafter in paragraphs fifty-one through fifty-three outlines a comparison of odor thresholds to the OSHA time weighted average for fifteen minute and eight hour intervals for TCE, TCA and Benzene. A review of Dr. Kopstein's report reveals the following conclusions: "I estimate that Conrail workers routinely breathed air above the wash racks which contained concentrations of trichloroethylene and trichloroethane in excess of OSHA limits. Under certain conditions, workers could have briefly been exposed to air in which the concentration of trichloroethylene or trichloroethane was well in excess of 100,000 parts per million (ppm)." Kopstein Report, pp. 5–6. In reference to Benzene, Dr. Kopstein also opined: "I have determined that workers' inhalation exposures to benzene were often well in excess of OSHA's permissible exposure limits." Kopstein Report, p. 7.

Recognizing that Dr. Kopstein is opining to "opportunities of exposure" and not an actual exposure-dose relationship coupled with the absence of actual air sampling of the Plaintiffs' workplaces during the period of time alleged in the various complaints, the Court accepts Dr. Kopstein's opinions as fit under the *Paoli III* analysis. The Court reaches this conclusion based upon the idea that Dr. Kopstein's opinions are viewed as part of the analysis used to determine exposure, but not the entire analysis. Further information and analysis would be needed for the jury to reach a conclusion of exposure. Dr. Kopstein's application of method is correct, but admittedly does not account for all of the factors necessary for him to make conclusions as to overall causation. However, Dr. Kopstein's analysis for TCE, TCA and Benzene provides insightful understanding of possible exposures. Actual exposure is an issue for the jury to decide. Credibility of testimony is also for the jury to consider. Reliability and fit are the only issues for the Court to decide with respect to Dr. Kopstein's opinion and the opinions of the other experts in this matter. The Court finds Dr. Kopstein's opinions based upon the Model to be reliable, fit and overall based upon "good grounds." To the extent that the Defendant has argued that other means of quantifying exposure and resulting dose estimates exist through objective means such as measurement of body fluids, that is an issue for the jury to decide. It is the province of the jury to determine the weight to be given to the information presented and whether one type of information is more credible than another. *See Kannankeril, supra.*

### 2. *David O. Wilson, M.D.*

**Findings of Fact**

■ Dr. Wilson is board certified in internal medicine, pulmonary medicine, preventative medicine (with subspecialty of occupational medicine) and critical care medicine. Wilson Depo. p. 9. Dr. Wilson restricts most of his "occupational medicine practice to occupational lung disease." Wilson Depo. p. 10. Dr. Wilson examined eight of the original Plaintiffs while reports on five of the Plaintiffs were submitted; one of which currently remains a Plaintiff, namely Mr. Frye.[8] Wilson Depo. pp. 14–16. Dr. Wilson had chest x-rays provided to him for Plaintiff Beckel but had to obtain chest x-rays for Plaintiff Frye. Wilson Depo. p. 17. Dr. Wilson did a complete medical history and complete pulmonary function tests on both Plaintiffs. Dr. Wilson also reviewed some medical records as well. Wilson Depo. pp. 17–

---

8. There is no expert report of record for Plaintiff Frye, but Dr. Wilson did speak to his expert report on Plaintiff Frye in his deposition found at Exhibit 1 to Document No. 35 at Civil Action No.1994–4J.

18. In the process of conducting his medical examinations, Dr. Wilson obtained occupational histories of these Plaintiffs and inquired as to respiratory problems, possible history of smoking, current medications and general medical history. Wilson Depo. p. 23. Dr. Wilson reviewed available medical records including chest x-rays and pulmonary function test results as well as current x-rays and pulmonary functions tests. Wilson Depo. pp. 23–24. Dr. Wilson based his conclusions upon his medical knowledge and experience and did not rely upon any literature or conduct any research. Wilson Depo. pp. 28–29. Dr. Wilson did not have Material Safety Data Sheets (MSDS) sheets available at the time of preparing his report; dose was not a specific consideration for him and in fact he did not obtain a measurement of dose. Wilson Depo. pp. 29–30.

### Analysis

Defendant attacks the opinions of Dr. Wilson based upon: 1) the fact that he did not consider dose; 2) his lack of knowledge about literature that supports the fact that certain solvents are linked to industrial bronchitis or that railroad workers have higher incidence of industrial bronchitis than the general population; 3) "he is unaware that post nasal drip causes bronchitis"; and 4) his belief that literature exists that link "small airways disease to chemicals, dust fumes, but does not cite any such sources." Defendant's Brief, p. 84.

The Defendant's argument appears once again to attack methodology and not qualifications. However, based upon the findings of fact that Dr. Wilson is sufficiently qualified to opine as to occupational disease, particularly pulmonary diseases and internal medicine in general, the Court finds Dr. Wilson is qualified as an expert in these areas of the medical field.

However, to the contrary, the Court finds Dr. Wilson's methodology is unreliable. Although not explicitly describing it as such, Dr. Wilson conducted a differential diagnosis through the use of medical records, medical history, physical exams, testing and radiological imaging of Plaintiff Frye. Dr. Wilson admittedly did not rely upon literature. It also was apparent in his deposition testimony that he was not concerned with the specific chemicals and substances with which the Plaintiffs had occupational contact. Wilson Depo. pp. 26–27, 51–52. In making his conclusions, it appears that Dr. Wilson concluded that from all the information used by him that the cause of the Plaintiffs' conditions was their occupational exposures. In fact, his conclusion that occupational exposure caused the respiratory complications faced by Plaintiff Frye was arrived at through pure differential diagnosis as he evaluated the medical evidence before him to exclude all other possible explanations for Plaintiff Frye's mild obstructive lung disease and industrial bronchitis.

The reliability of differential diagnosis has been approved in this circuit. *Heller v. Shaw Industries, Inc.,* 167 F.3d 146, 154–155 (3rd Cir.1999); *Paoli III,* 35 F.3d 717, 742, n. 8 (3rd Cir.1994). The Court will therefore dispense with a step-by-step analysis of the eight steps of *Paoli* to find reliability in the methodology of differential diagnosis in general. However, the use of differential diagnosis does not create a *per se* reliable conclusion. This issue was also addressed in *Heller, supra.*

In *Heller,* the Third Circuit found that an expert employing a differential diagnosis could not have his opinion automatically excluded for failure to find support for his diagnosis in medical literature, but a differential diagnosis cannot "sanitize an otherwise untrustworthy conclusion," which lacks "foundation." *Heller* at 156. The

Third Circuit emphasized that the question is not whether scientific studies have been published supporting the results of the differential diagnosis; the question is whether the overall conclusion of the expert is based on good grounds and does not have analytical gaps within its foundation. *Heller* at 155–156. In essence, the Third Circuit has concluded that published scientific studies are not the *sine qua non* support needed to confirm a differential diagnosis. *Id.*

Dr. Wilson's methodology lacks the last component of reliability necessary to connect his diagnosis to any occupational exposure of Plaintiff Frye. Wilson Depo. pp. 44–48. Dr. Wilson's exclusion of other possible diagnoses does not allow him to make the leap of logic that exposures in the workplace caused Plaintiff Frye's illness when he did not consider what substances Plaintiff Frye could have been exposed to in his workplace. Other than asbestos, Dr. Wilson is unaware of Plaintiff Frye's exact exposures. Dr. Wilson could have investigated Plaintiff Frye's other possible exposures to confirm the types and nature of Plaintiff Frye's substance exposure or at a minimum inquired as to the nature of the substances with which Plaintiff Frye had possible contact, however, Dr. Wilson failed to do this. In *Heller*, the court concluded that the knowledge that carpets do emit VOCs, which are the origin of some health difficulties, could constitute "good grounds" for the diagnostic conclusion that the plaintiff's respiratory illness was indeed caused by the household carpet. *Heller* at 156.

Turning back to the cases *sub judice*, it is conceivable that if Dr. Wilson had considered what Plaintiff Frye's exposures were he would also have concluded that such substances could not affect Plaintiff Frye in the manner he alleges. If Dr. Wilson knew of Plaintiff Frye's exposures and it was known that such exposures do not equate to his diagnosis, that could have resulted in Dr. Wilson examining Plaintiff Frye again. To conclude that four likely causes exist for a condition and the first three have been excluded, and therefore the fourth is the cause is consistent with the methodology of a differential diagnosis. Such technique is heavily relied upon by physicians and the Third Circuit in *Heller* recognizes that fact. However, the issue in the case *sub judice* and in *Heller* is whether the technique of differential diagnosis and its conclusions meets the requirement of reliability necessary to permit such conclusions to be presented to the jury. Without consideration of the alleged remaining cause, namely occupational exposure which was determined by Dr. Wilson to be the cause, Dr. Wilson's testimony must be excluded because it is based upon an unreliable methodology in that it lacks proper analysis and explanation relating occupational exposure of various substances to Plaintiff Frye's industrial bronchitis.

### 3. *Lisa Morrow, Ph.D.*

### Findings of Fact/Conclusions of Law

██ No deposition exists of record for Dr. Morrow and three of her four expert reports for Plaintiffs D. Hoover, Keagy, and Picano are also not of record. The only expert report of record for Dr. Morrow is her report concerning Plaintiff Lang. In the absence of any evidence from the proponent of the testimony demonstrating that the evidence is admissible, the Court must exclude Dr. Morrow's opinions as to D. Hoover, Keagy, and Picano. As to Dr. Morrow's opinions regarding Lang, the Court will consider their admissibility based upon her expert report, found of record at C.A. No.1994–4J, Document No. 42, Exhibit 29. The Defendant makes no specific argument as to Dr. Mor-

row's opinions in its brief. Instead, the Defendant applies an argument regarding lack of scientific evidence of "general causation" of permanent central nervous system (CNS) damage when the alleged low dose exposures to the Plaintiffs did not result in a loss of consciousness. Defendant's Brief, pp. 61, 71. In addition, the Defendant argues that the criteria utilized by Dr. Morrow do not permit any physician "to make a differential diagnosis" or "an association between the diagnosis and the occupational exposure." Defendant's Brief, p. 83. There is no further argument that is specific to Dr. Morrow and her opinion as to Lang. Therefore, it appears to the Court that the Defendant is challenging Dr. Morrow's conclusion on the basis that it lacks good grounds and is not based upon the examination of Lang performed by her, which were never mentioned in the Defendant's brief.

Lang complained to Dr. Morrow of "frequent headaches, nausea, skin rashes, weakness and diarrhea." Exhibit 29, p. 1. While many of these symptoms have improved, Lang reported loss of memory and attention that have not improved since they began in 1993. *Id.* Dr. Morrow obtained a medical and social history of Lang. Dr. Morrow noted no tobacco use or any significant alcohol use. *Id.* Dr. Morrow administered twenty separate tests set forth in her report. Exhibit 29, p. 2. Dr. Morrow concluded that the resulting test score indicates "possible organic involvement." *Id.* Dr. Morrow recommended "pharmacological intervention" be used because of Lang's "elevated anxiety and depression". Exhibit 29, p. 3. Dr. Morrow indicated that a SPECT or PET scan "may provide additional evidence of organicity." *Id.*

### Analysis

Defendant attacks generally Dr. Morrow's opinions based upon the assertion that the Plaintiffs' alleged exposure to and dosages of substances like TCE and TCA that did not result in loss of consciousness have not been scientifically proven to result in the permanent CNS damage alleged by the Plaintiffs. The Defendant further argues that in the absence of scientific evidence of the Plaintiffs' claims, epidemiological evidence must be utilized to prove the alleged permanent CNS damage. The parties proceed to argue general causation and the presence or lack thereof as it relates to the theory of causation suggested by the Plaintiffs. However, the Court's analysis can be made in much simpler detail than the parties have suggested. This is because there is no evidence of Dr. Morrow's methodology. It is true that she performed several tests from which psychologists and psychiatrists can discern and identify the specific mental deficits their patients may possess. Yet in the absence of evidence of her method of diagnosis or furthermore her qualifications as a psychologist, the Court cannot determine whether Dr. Morrow qualifies as an expert possessing sufficient knowledge and skill to diagnose mental or cognitive illness that resulted from solvent exposure.

The Court is without any guidance as to how the results of the tests administered by Dr. Morrow to Plaintiff Lang equate with "organic involvement." There is too little information as to Dr. Morrow's qualifications and the method she utilized in arriving at her suggested answer of a possible cause, *i.e.*, Dr. Morrow did not explain her conclusions. Our review of her report on Lang reveals a large analytical gap where the results of the tests administered are determined to indicate organic involvement because of their "pattern." While it is possible that the foundation of Dr. Morrow's conclusion is a part of a theory of science that is presently unproven, but that could be proven in the future,

the Court cannot accept such an analytical gap as found in her opinion. Dr. Morrow's opinion is *ipse dixit* until it is established that she possesses the knowledge and skill to testify to such an opinion and what methodology was used to reach that opinion. Production of such evidence is the burden of the proponent of the evidence and that evidence is lacking in this record. *See Paoli III*, 35 F.3d 717, 744 (3rd Cir. 1994). Because of these two deficiencies, the lack of evidence as to qualifications and an unbridged analytical gap between the tests administered and how the results equate to "possible organic involvement", Dr. Morrow's opinions as to Plaintiff Lang are hereby disqualified.

### 4. *John J. Shane, M.D.*

#### Findings of Fact

■ Dr. Shane examined six Plaintiffs in this matter: Leonard Simendinger, Dennis Vaughn, Warren Stahl, James A. Miller, Charles Robertson, and Fred W. Snyder. Of these six, only James A. Miller has a civil action pending before the Court. Miller died from lung cancer, specifically a squamous cell carcinoma.[9] Shane Report of 1/19/1996, (Defendant's Motion, Exhibit 3) p. 3. There existed a span of six years between the time of Miller's cessation of cigarette smoking and the onset of his cancer. Shane Depo. (Defendant's Motion, Exhibit 12) pp. 118–119. Such an interval of time does not allow for exclusion of Miller's cigarette smoking as a factor in the causation of his cancer. *Id.*

Dr. Shane's technique or method in evaluating the Plaintiffs, such as Plaintiff Miller, and reaching a conclusion as to the causation of their alleged occupationally caused conditions is that Dr. Shane would take a detailed medical history of each patient, physically examine each patient with each exam having some commonality with certain medical tests and observations, but also focusing individually upon each patient's known conditions, and considering those exams with the notes of exams conducted on the same Plaintiffs by an individual named Dr. Blaisdell, and the toxicological and exposure data from the Conrail facility. Shane Depo. pp. 22–23, 43–45, 66–67; Shane Aff., (Defendant's Motion, Exhibit 5) ¶ 3. Although labeled as such only once in the record before the Court, it is the Court's finding that Dr. Shane's method in evaluating the Plaintiffs was one of differential diagnosis. *See* Shane Aff. ¶ 13. Dr. Shane is board certified in pathologic anatomy and clinical pathology (includes certification in chemistry and toxicology). Shane Depo. pp. 11–12.

#### Analysis

Dr. Shane's report as to Plaintiff Miller reads as follows:

James A Miller was 57 years old at the time of his death on November 8, 1995. He had been an employee from 1976 to 1981 and then from 1989 onward of Conrail where he was exposed to galvanized material, asbestos, various solvents and cleaners, trichloroethylene, as well as the fumes of various burning projects of toxic materials. Mr. Miller had a pulmonary malignancy of his right lung with extensive metastatic disease. His lesion was a squamous cell carcinoma which is a lesion linked to cigarette smoking, however, Mr. Miller, while he had been a cigarette smoker, had not smoked for a number of years prior to his diagnosis. The correlation between asbestos and inhalant exposure and pulmonary carcinomas is well documented.

dated September 24, 1996.

---

9. Mr. Miller's widow, Delores M. Miller, was substituted for him by order of Judge Smith

In a person who had quit smoking a number of years prior to his diagnosis but in whom continuous toxic exposure including asbestos exposure had occurred, one must consider those factors as preeminent ideologies [sic] for the persons' disease. It is my opinion that industrial exposure played a significant role in the ideology [sic] of Mr. Miller's pulmonary cancer.

Shane Report of 1/19/96, p. 3.

The Defendant first points out that Dr. Shane is a pathologist and not an internist or family practitioner although he performed several physical exams of the Plaintiffs. Defendant's Brief, p. 42. Next, the Defendant indicates that Dr. Shane used the self-reporting of the Plaintiffs, and not any testing or data as to exposure or calculation of a dose, to conclude that the Plaintiffs' conditions were a result of toxic exposure. Defendant's Brief, p. 43. Further, Dr. Shane has recognized the applicability of the Bradford Hill criteria [10] in determining the role chemical agents may play in causality of diseases, but did not utilize that method in this case. *Id.* The Defendant also argues that with a lack of epidemiological evidence proving that the Plaintiffs' rates of contraction of their diseases are higher than contraction rates of the general public, Dr. Shane's opinions should be excluded from evidence. Defendant's Brief, pp. 48–49. A history of smoking, argues the Defendant, is a factor sufficient to cause Miller's cancer. Defendant's Brief, p. 51. The Defendant also argues that Dr. Shane attempted to discredit plausible confounders of the Plaintiffs' diagnoses. Defendant's Brief, pp. 57, 59.

Plaintiff Miller counters these arguments by stating that Dr. Shane recognized Miller's history of smoking, his cessation of smoking, the link between squamous cell carcinoma and smoking, and that his history of smoking combined with asbestos exposure to act "synergistically," thereby increasing the effects of each other. Plaintiffs' Brief, p. 43. Miller notes his exposure to asbestos due to incinerator ash or scraping asbestos off of the steam jennies. Plaintiffs' Brief, p. 45. However, Miller's present counsel has represented to the Court that asbestos exposure is not going to be pursued in Miller's civil action absent the Defendant raising asbestos as an alternative causation. Argument Tr. pp. 86–88 (Document No. 84 at C.A. No.1994–4J).

Initially, the Court notes that the reliability of an expert does not hinge upon the specialization he practices or board certification he possesses. *Holbrook v. Lykes Bros. Steamship Co., Inc., et al.,* 80 F.3d 777, 782 (3rd Cir.1996) (citing *In re: Paoli R.R. Yard PCB Litigation ("Paoli III"),* 35 F.3d 717, 753 (3rd Cir.1994); *In re: Paoli R.R. Yard PCB Litigation ("Paoli I")* 916 F.2d 829, 856 (3rd Cir.1990)). Therefore, the fact that Dr. Shane is neither board certified in medicine nor practices it automatically result in his opinion, based upon differential diagnosis, being unreliable. As noted in previous analyses

10. These criteria are 1) temporal relationship; 2) strength of association; 3) dose-response relationship; 4) replication of the findings; 5) biological plausibility (coherence with existing knowledge); 6) consideration of alternative explanations; 7) cessation of exposure; 8) specificity of the association; and 9) consistency with other knowledge. REFERENCE MANUAL ON SCIENTIFIC EVIDENCE p. 375 (2d ed.2000). In footnote 113 of the Reference Manual, A. Bradford Hill is quoted regarding these criteria as saying "None of my nine viewpoints can bring indisputable evidence for or against the cause-and-effect hypothesis and none can be required as a *sine qua non.*" REFERENCE MANUAL ON SCIENTIFIC EVIDENCE p. 376 n. 113 (2d ed.2000) (*quoting* A. Bradford Hill, *The Environment and Disease Association or Causation?,* 58 Proc. Royal Soc'y Med. 295 (1965)).

of other experts above, differential diagnosis is a reliable methodology in diagnosing medical conditions. Accordingly, Court will not engage in the eight factor analysis of *Paoli III* to come to this conclusion. However, the Court will address the Defendant's specific arguments.

First, it is the contention of the Defendant that Dr. Shane accepted as true the self-reporting of exposure of the Plaintiffs, specifically Plaintiff Miller, without confirming the presence of a dose to which Plaintiff Miller was subject. However, Dr. Shane generally relied upon the fact that the length of time of exposure (Shane Depo. pp. 37–39, 50, 96–97, 104, 109) of the Plaintiffs to toxic substances along with the fact that removal from that environment revealed a lessening of symptoms (Shane Depo. pp. 56–57, 109) demonstrates a temporal relationship between an admittedly unquantified exposure (Shane Depo. pp. 35–36, 37, 55, 104–106, 145–146, 152) and the causation of the Plaintiffs' illnesses, including Miller's lung cancer (See Shane Depo. pp. 115–119). Such a temporal analysis as a part of differential diagnosis is sufficiently reliable under *Daubert* and *Paoli III* to conclude that the data "fits" a doctor's differential diagnosis. *Heller v. Shaw Industries, Inc.*, 167 F.3d 146, 158 (3rd Cir.1999). Therefore, the lack of measurement of exposure and/or dose does not preclude Dr. Shane from making his conclusions while he is using a temporal analysis to support such conclusions.

Second, the Defendant attacks Dr. Shane's failure to implement the Bradford Hill criteria to evaluate the causation of the Plaintiffs' allegations. The Court does not find this attack to be viable. The failure to use these criteria does not negate the reliability and fit of Dr. Shane's opinions. Dr. Shane employed differential diagnosis to make his conclusions. Differ-

ential diagnosis, as stated previously, has been recognized as a reliable method to determine causation on issues of medicine, particularly internal medicine. If the Defendant believes Dr. Shane's employment of this method rather than the Bradford Hill criteria was in error, the Court views such an issue as one of credibility regarding Dr. Shane's expertise and thoroughness, not the reliability of the method used by him to arrive at his opinions.

Third, the Defendant points to the lack of epidemiological evidence which demonstrates the rates of the Plaintiffs' ailments and conditions to be of a higher incidence than in the general population. The Third Circuit in *Paoli III* addressed this issue in the context of a summary judgment motion. As reasoned in *Paoli III*, even if the alleged exposed persons had levels of substances in their bodies within the background levels, causation could still be proven by demonstrating that the levels measured from those persons resulted from exposure. However, this exception was reserved for those "most egregious polluters" whose actions would cause such consistent levels of exposure. *Paoli IV*, 113 F.3d 444, 461 (3rd Cir.1997). Should the evidence demonstrate such a level of contamination in the case *sub judice*, then an exception would be warranted for the Plaintiffs' background levels. Nevertheless, the Court believes the issue as to background levels is more properly resolved in the context of a summary judgment motion. Thus, the Court denies this part of the Defendant's Motion without prejudice to it raising this issue again in the context of a summary judgment motion.

Dr. Shane's differential diagnosis coupled with his temporal analysis of exposure supports his conclusions as to causation from occupational exposure. This reasoning is consistent with the *Paoli III* opinion

finding that requiring research supporting a theory of general causation would "doom" all cases where the research on that subject was in its infancy. *Heller v. Shaw Industries, Inc.*, 167 F.3d 146, 155 (3rd Cir.1999)(citing *Paoli III*, 35 F.3d 717, 743–745 (3rd Cir.1994)). The Plaintiffs need only demonstrate "good grounds" for their opinions and are not subject to a summary judgment standard in the present review. The lack of plaintiff-specific epidemiological studies or general epidemiological studies as compared to the ratio of incidence found in the Plaintiffs' cohort should not "doom" Dr. Shane's opinions. This is so because the presence of "good grounds" for his conclusions exists as a result of his temporal relationship analysis. Dr. Shane's temporal relationship analysis provides the "good grounds" for his linking the alleged exposure and the alleged causation. "Good grounds" is all the Plaintiffs need to survive this current *Daubert* challenge to Dr. Shane.

Finally, as to the Defendant's arguments regarding the smoking history and exclusion of possible confounders in Dr. Shane's opinion, the Court finds that Dr. Shane's opinion is reliable and fit. Dr. Shane states in his deposition that Plaintiff Miller's cancer was a result of a combination of cigarette smoking and asbestos exposure. However, since asbestos exposure is no longer part of the Plaintiffs' cases, Dr. Shane's opinions also consider other occupational exposures to substances such as TCE, TCA, solvents and cleaners and he concludes they would have the same additive effect with Plaintiff Miller's cigarette smoking to result in Plaintiff Miller's pulmonary cancer. Shane Depo. pp. 116–117. The Court recognizes that Dr. Shane's opinion considers Plaintiff Miller's smoking, his cessation of smoking and continual occupational exposure to toxic substances in arriving at his conclusion.

The Defendant once again emphasizes the role of cigarette smoking in the etiology of Plaintiff Miller's cancer; this is a credibility issue for the jury. In pointing to this alternative cause, the Defendant is essentially forcing Dr. Shane to explain why an alternative cause (smoking cigarettes) is not the cause of Plaintiff Miller's cancer. *See Paoli III*, 35 F.3d 717, 760 (3rd Cir.1994).[11] Dr. Shane has countered this with his explanation of additive effect between occupational exposures and cigarette smoking in which he concludes: "It is my opinion that industrial exposure played a significant role in the etiology of Mr. Miller's pulmonary cancer." Shane Report of 1/19/1996, p. 3. The Court takes no position as to whether cigarette smoking was causally related to Plaintiff Miller's cancer. The Court finds that the admission of Dr. Shane's testimony as to Plaintiff Miller is appropriate under these circumstances in light of *Paoli III:*

> The judge might think that there are good grounds for an expert's conclusion even if the judge thinks that there are better grounds for some alternative conclusion, and even if the judge thinks that a scientist's methodology has some flaws such that if they had been corrected, the scientist would have reached a different result.

---

**11.** *Paoli III* sets forth two situations where exclusion of an opinion based upon differential diagnosis was possible: 1) where failure to engage sufficient "standard diagnostic techniques" used to assess alternative causes and no explanation is given as to why, in the absence of these techniques, that the opinion remains reliable; or 2) defendant offers an alternative cause of illness other than an alleged cause originating from the defendant, and the expert does not present a reasonable explanation why he continues to find the defendant's "actions were a substantial factor in bringing about that illness." *Paoli III*, 35 F.3d 717, 760 (3rd Cir.1994).

* * *

A judge frequently should find an expert's methodology helpful even when the judge thinks that the expert's technique has flaws sufficient to render the conclusions inaccurate. He or she will often still believe that hearing the expert's testimony and assessing its flaws was an important part of assessing what conclusion was correct and may certainly still believe that a jury attempting to reach an accurate result should consider the evidence. *See Paoli I,* 916 F.2d at 857 (helpfulness requires more than bare logical relevance, but there is a strong preference for admission) (citing *Downing,* 753 F.2d at 1235).

*Paoli III,* 35 F.3d 717, 744–745.

Therefore, in consideration of Dr. Shane's opinions as to Plaintiff Miller, the only remaining Plaintiff of whom an examination was conducted and opinion given by Dr. Shane, the Court finds good grounds for Dr. Shane's opinion, that is to say Dr. Shane possesses the professional qualifications, and his opinion as to Plaintiff Miller is both reliable and fit to a degree so as to be admissible at trial.[12]

### 5. Allene J. Scott, M.D.

**Findings of Fact**

■ Dr. Scott gave opinions as to six specific Plaintiffs: Schultz, Simpson, Shannon, Picano, Lang, and Keagy. Albers Aff., (Document No. 34 at C.A. No.1994–4J) Exhibit E. Scott Aff. (Document No. 44 at C.A. No.1994–4J) ¶ 8. Only Picano, Lang and Keagy remain as Plaintiffs from among these six men. *Id.* Dr. Scott is a licensed medical doctor in Pennsylvania. Scott Aff. ¶ 1. As of the latest information provided in the record, Dr. Scott held the position of Assistant Professor and Associate Director, University of Pittsburgh, Graduate School of Public Health, Department of Environmental and Occupational Health, Division of Occupational and Environmental Health. Scott Aff., ¶ 2. Dr. Scott is a Diplomat of the American Board of Preventative Medicine (Occupational Medicine) and a Fellow of the American College of Occupational and Environmental Medicine. Scott Aff. ¶ 4. Dr. Scott has researched and written on topics concerning the effects of solvents outside of the arena of litigation. Scott Aff. ¶ ¶ 5, 7.

While serving in the Navy, Dr. Scott was an occupational health officer and also the head of the Division of Occupational Medicine. Scott Aff. ¶ 3. Dr. Scott's use of the Q–16 questionnaire [13] was not the only "tool" used in her clinical analysis of the Plaintiffs, but was in fact one method used to accumulate background data on the Plaintiffs' medical histories and lifestyles to facilitate the evaluation of their alleged exposure to solvents and other harmful substances. Scott Aff. ¶ 27. Dr. Scott's diagnosis of "solvent encephalopathy" for each Plaintiff was not based upon the Q–16

**12.** Defendant raises an objection to Dr. Shane's testimony in footnote twelve of its brief stating that his testimony should be excluded under Federal Rule of Evidence 403 based upon his "truly remarkable (and unsubstantiated) opinions. Similarly, given that his expertise is limited to pathology, he is not qualified to offer the proffered causation opinions." Defendant's Brief, p. 60, n. 12. Although no specific reason under Rule 403 is cited, and viewing the rule in its entirety, the Court finds no issues of unfair prejudice, confusion of issues, misleading of the jury, undue

delay, waste of time or needless presentation of cumulative evidence within the Defendant's terse argument. Therefore, on this point, the Defendant's motion *in limine* is denied.

**13.** This questionnaire was administered to the Plaintiffs examined by Dr. Scott and consisted of sixteen "yes" or "no" questions. It is also known as the "Validated Questionnaire for Solvent–Exposed Workers." See Albers Aff., Exhibit E, Expert reports attached thereto.

questionnaire. Scott Aff. ¶ 27. Questionnaire results were utilized to the extent that "they give an impression of the degree of symptomatology present." Scott Aff. ¶ 27.

It is Dr. Scott's practice to refer patients to neuropsychological testing prior to making a final finding of solvent encephalopathy so as to confirm her clinical findings of solvent encephalopathy; a diagnosis of Type I solvent encephalopathy does not require neuropsychological testing for its confirmation. Scott Aff. ¶ 28. Scott Depo. (Document No.34 at C.A. No.1994-4J, Exhibit E) pp. 39–42. Dr. Scott performed a medical examination, took medical histories, reviewed the medical records of Plaintiffs Picano, Lang, and Keagy and referred these Plaintiffs for various tests before other doctors. See Dr. Scott's reports of Picano, Lang and Keagy, attached to Dr. Albers Aff., Exhibit E. Based upon all of this information, Dr. Scott set forth her various impressions as to each Plaintiff. *Id.* Dr. Scott performed a differential diagnosis to the extent of determining if solvent exposure was to be attributed for the Plaintiffs' various conditions. Scott Depo. p. 136.[14]

### Analysis

The Defendant argues generally that the studies concerning toxic encephalopathy do not demonstrate a causal link between low dose exposure to organic solvents and permanent CNS damage. Defendant's Brief, p. 61. Defendant further argues that Dr. Scott's methodologies are unreliable for the fact that "no objective signs ... substantiate the symptoms of irritability, headache, memory loss, fatigue and lightheadedness" possessed by the Plaintiffs. Defendant's Brief, pp. 72–73.

Defendant also points out that the methodology of Dr. Scott is unreliable because of the fact that the Q–16 questionnaire she utilized was invalid in that it is not an objective vehicle to utilize in diagnosing a disease and the Q–16 questionnaire sought information on occupational solvent-induced encephalopathy, a "controversial and unproven" diagnosis. Defendant's Brief, p. 73. Specifically, as to the issue of the objectivity of the Q–16 questionnaires, the Defendant argues that the factors of bias and confounding cannot be eliminated. *Id.* As for the second issue, it is argued that a lack of a proven general causation theory in the literature regarding solvent-induced encephalopathy is a "draw back" to the questionnaire method of Dr. Scott. Defendant's Brief, pp. 73–74.

Although the Defendant has generally attacked Dr. Scott's position on the basis that no scientific studies exist to link low-dose exposure to organic solvents and any resulting CNS damage, Dr. Scott has countered in her affidavit that the Maizlish study (used as support for the Defendant's position) does not study individuals exposed for at least ten years-the minimum time period necessary for determining the presence of CNS deficits in those individuals exposed to low-doses of organic solvents. Scott. Aff. ¶ 24. Dr. Scott further cites the textbook *Occupational Epidemiology* by Dr. R. Monson wherein he

---

**14.** The following excerpt provides support for this finding: "Q[Mr. Houghton]: Now, but just so I'm clear, you were not asked to determine and make a differential diagnosis as to other causes of problems or complaints, for example, irritability, anxiety, fatty liver. Doctor, I understand you're a medical doctor, you're trained to do these things, but in this case you were asked specifically to determine whether, you know, these complaints were related or could be related. But you weren't asked to rule in, rule out or make a differential diagnosis. I mean, you didn't do that here; did you? A[Dr. Scott]: It's done to the extent that those diagnoses would be responsible for the findings that are or could be attributed to the solvent exposure."

recognizes the shortcomings of the Scandinavian studies, used as support for the Plaintiffs' position and also criticized by the Defendant, but overall notes that the studies, when compared, demonstrate an association between low-dose exposure to solvents and "disabling neurobehavioral disease." Scott Aff. ¶ 17. The Court finds that the Plaintiffs have sufficiently countered the Defendant's criticisms of the then-existing research to support their conclusions, specifically the conclusions of Dr. Scott, in order to comply with *Paoli III*. *See* footnote 10, *supra* (citing *Paoli III*, which requires an expert to rebut asserted alternative causes).

As for the Defendant's contention that the symptoms of the Plaintiffs do not have objective markers, the Court finds the Defendant to be correct in part. The parties assert conflicting positions concerning whether these symptoms could be indicative of solvent exposure or a host of other ailments aside from such exposure and whether any medical or scientific test can link the symptoms to a sole cause. While this may be true, it is the function of the jury to determine the credibility of the experts and their theories of causation, not the Court. The Court cannot choose the Defendant's experts' theories over the Plaintiffs' experts' theories under this motion; our function is to determine the reliability and fit of Dr. Scott's theory. The fact that alternatives to her theory exist is a matter left for trial and that fact does not affect the reliability and fit of Dr. Scott's opinions.

As to the Defendant's criticisms of the Plaintiffs' use of the questionnaire, Q–16, this questionnaire was not the sole basis

for Dr. Scott's diagnosis. It was a tool used to gather background information, particularly medical history, as it related to the Plaintiffs' possible solvent exposure. Dr. Scott utilized other medical tests as well as medical records and her physical examination of the Plaintiffs to arrive at her diagnosis of solvent encephalopathy. While the Defendant is correct that the questionnaire may not be sufficiently objective, Dr. Scott indicated that one purpose of the questionnaire was to ensure the complete recording of the Plaintiffs' medical complaints to assist in the Plaintiffs' medical evaluation. Scott Depo. p. 44.[15] However, Dr. Scott also utilized this questionnaire to determine if the person being examined should be referred for neuropsychological testing.[16] This demonstrates that Dr. Scott sought a thorough examination of these Plaintiffs and ordered further testing to be conducted to confirm her diagnosis rather than accepting as fact the Plaintiffs' self-reports. Neuropsychological testing was not the only testing sought by Dr. Scott for these Plaintiffs. Therefore, to that extent there will be bias and possible confounding in the answering of the questionnaire by the Plaintiffs, Dr. Scott's approach in assessing the Plaintiffs' conditions is sufficiently reliable to allow her to diagnose the condition of the Plaintiffs without being tainted by any possible bias or confounding. Viewing Dr. Scott's use of this questionnaire as part of properly performed differential diagnoses and not as the sole basis of her medical opinions, the Court finds that the use of the Q–16 questionnaire is not fatal to the reliability or fit of Dr. Scott's opinions.

---

15. Dr. Scott testified that another purpose of the questionnaire was to detect those individuals who sometimes present without any medically related complaints, but who are still affected neuro-cognitively from solvent exposure. Scott Depo. p. 46.

16. Answering "yes" to six or more out of a total of sixteen questions was necessary for such a referral. Scott Depo. pp. 44–45.

And finally, the Defendant's challenge to the lack of literature supporting the general causation theory as alleged by the Plaintiffs is without merit. As previously addressed, the case law does not require the presence of scientific literature to support an allegation of liability so long as the medical opinions provided in support of a finding of liability are reliable opinions, *i.e.* possessing "good grounds". *See Heller, supra.* In addition, the Plaintiffs have countered the Defendant's interpretation of then-existing studies regarding solvent encephalopathy as previously discussed. It is not the Court's duty to weigh the opinions of opposing experts or endorse one opinion over another; such a task should be left for the jury. The Court finds that Dr. Scott's opinions are reliable and fit, and with no challenge to her professional qualifications, that she is a qualified to opine as to the diagnoses of the Plaintiffs.

### 6. *Michael LeWitt, M.D.*

#### Findings of Fact

██ Dr. LeWitt opined as to the conditions of seven of the remaining Plaintiffs: Edward Wicker, Walter Zolna, Randy Coho, Ronald Hoover, Don Miller, Charles Smouse and Larry Steele. Albers Aff., (Document No. 34 at C.A. No.1994–4J) Exhibit F, Medical reports attached thereto. Dr. LeWitt is a medical doctor licensed in the Commonwealth of Pennsylvania. LeWitt Depo. I, p. 5. In his opinion, Dr. LeWitt does not think that neuropsychological testing is required to confirm a diagnosis of toxic encephalopathy in every suspected case. LeWitt Depo. I, pp. 40–43. He believes neuropsychological testing of the Plaintiffs would not be beneficial under the present circumstances because any such testing done more than two to three years after exposure will not lend guidance as to a thera-

py plan for the patient. LeWitt Depo. I, pp. 43–44, 51–52. The method of evaluation used by Dr. LeWitt was the taking of an occupational history and conducting a physical examination, which included tests of memory and cognitive functioning. LeWitt Depo. I, pp. 51–52. Dr. LeWitt did not have relevant industrial hygiene information available to him at the time of the Plaintiffs' physical examinations. LeWitt Depo. I, pp. 22–23. The Court finds that Dr. LeWitt engaged in a method of analysis that would be considered differential diagnosis, but did not diagnose any of the Plaintiffs or obtain information as to what chemicals each of the Plaintiffs were exposed to. Albers Aff., Exhibit F, Medical reports attached thereto.

#### Analysis

Defendant argues that: 1) Dr. LeWitt could not tell what the exposures were for any individual and if they exceeded the threshold limit value (TLV) for any chemical for any period of time (Defendant's Brief, p. 77); 2) Dr. LeWitt cannot properly form an opinion on causality in the absence of a diagnosis; 3) he did not conduct pulmonary function testing and chest x-rays on every Plaintiff (Defendant's Brief, pp. 78, 80); and 4) he did not consider all confounders or other possible causes for the Plaintiffs' illnesses (Defendant's Brief p. 80).

The first criticism of Dr. LeWitt is that he cannot quantify the Plaintiffs' exposures or if they exceeded the applicable TLVs for a specific period of time. This argument appears best left for a motion on summary judgment as it considers issues of causation rather than the methodology of Dr. LeWitt.

However, in reviewing the methodology of Dr. LeWitt's differential diagnosis, the unreliability in his methodology and resulting opinions is plainly revealed. Dr. LeW-

**734**

itt assumed the agents to which his examinees were allegedly exposed were all the same agents. Dr. LeWitt indicates as such in his second deposition where the Plaintiffs stated in their physical examinations that they could not remember what they were exposed to or that they were exposed to every agent because they worked in every area of the plants: ·

Q: So how much time would you spend with him getting the exposure information that he had at work, roughly?

A: Well, I guess to the extent that it's possible I had a list of what people may have been exposed to and I asked about that. I may have asked in a general sense since I asked about working around the barrel press, and I knew that was a source of some of the exposures, whether people had worked around that. I don't know that I went down the list of every possible exposure with each individual, because it seemed to me at this point that people either didn't remember exactly what they were exposed to or said, I was exposed to everything in the plant because I did this job or that job and the stuff was all around.

LeWitt Depo. II, pp. 50–51. Dr. LeWitt further explains his lack of information as to Plaintiff Wicker:

Q: For example, Doctor, and I don't mean to beat a dead horse, you don't have any indication of where he was working, the chemicals that he might have been exposed to, the years? For example, was it in the 70s? Was it in the 80s? Was it in the 90s?

A: No.

Q: You don't have any of that?

A: That's true. And I don't know that that information was available to me at the time. I didn't ask for it because I just didn't think it was available.

Dr. LeWitt's reports indicate a similar lack of information for each the seven Plaintiffs he examined. The introductory paragraph of each of the seven reports reads in substantial similarity to the following:

You were examined at Great Valley Health Occupational Medicine, Paoli Memorial Hospital, on July __ 1997, in connection with your work at Conrail. You indicated that you work/have worked as a _____ at Conrail for ___ years. As part of your work, you have had a variety of exposures to chemicals, including some or all of the following: Trichloroethane, Diesel Fuel, Gasoline, Turpentine, Lacquer Thinner, Enamel Thinner, Creosote, Tar, PCBs, and other substances including solvents and dusts.[17]

See Albers Aff., Exhibit F, Medical reports attached thereto. The Court has difficulty accepting the proposed reliability of this Plaintiffs' expert when he is forming opinions on causation before knowing exactly what are the possible factors affecting that causation. This is not a matter of dose or even exposure, but it is a matter of "good grounds" on which expert opinions are required to be based under *Paoli III*.

The Court cannot conceive that an expert can opine as to causation without understanding the possible factors affect-

---

**17.** The only differences among the introductory paragraphs appear in Plaintiff Coho's report, which contains reference to TCE and asbestos, Plaintiff Miller's report, which contains a reference to leaded paint, and Plaintiff Zolna's report, which contains a reference to carbon tetrachloride.

ing causation. Knowledge of what chemicals were present in the workplaces of these seven Plaintiffs would appear to be the first logical step in conducting a differential diagnosis that would evaluate the theory that chemical exposure in the workplace has resulted in these Plaintiffs' illnesses. Without that factual cornerstone, Dr. LeWitt would be without good grounds to conclude in his opinion that any workplace exposure resulted in the Plaintiffs illnesses. Other courts have come to the same conclusion: "However, the expert's conclusions regarding causation must have a basis in established fact and cannot be premised on mere suppositions or if based on assumed facts, there must be some basis for the assumptions in the record. *McLean v. 988011 Ontario, Ltd.,* 224 F.3d 797, 801 (6th Cir.2000)." *Asad v. Continental Airlines, Inc.,* 314 F.Supp.2d 726, 740 (N.D.Ohio., 2004). Based upon this conclusion, the Court excludes Dr. LeWitt's testimony and reports as to the seven Plaintiffs for which he had provided opinions. The Court will not address further the Defendant's other arguments as to Dr. LeWitt's opinions at this time.

## III.  DEFENDANT'S MOTION TO ENFORCE RELEASE

■ The Defendant has filed a Motion to Enforce Release (Document No. 32 at C.A. No.1994–23J) as to Plaintiff Terry L. Frye. Defendant claims that Plaintiff Frye signed an agreement to release the Defendant from liability, and signed and cashed the settlement checks given to him, but refuses to sign a stipulation and order of dismissal.

This matter was assigned to this Court on May 13, 2004. Prior to that assignment, on January 16, 2004, the Defendant filed its Motion to Enforce Release. Plaintiff did not file a formal response, but sent a letter to the then-presiding Judge Fullam requesting an extension of time to respond to the Defendant's Motion because Plaintiff's counsel wanted to investigate the role played by the law firm that negotiated the Release in question because that law firm had represented the Plaintiff in his musculoskeletal claim only. See Exhibit 1 to Defendant's Response (Document No. 38 at C.A. No.1994–23J).

Judge Fullam did not enter an order on the record denying or granting the Plaintiff's request. Plaintiff Frye thereafter filed a Motion Pursuant to Rules 26(b) & 60(b)(3) Federal Rules of Civil Procedure to Take Discovery to Reply to Defendant's Motion to Enforce a Release (Document No. 37 at C.A. No.1994–23J) on August 31, 2004. Defendant filed a response to the Motion to Take Discovery on September 8, 2004. The Court denied the Plaintiff's Motion to Take Discovery on September 24, 2004 citing the inapplicability of Federal Rule of Civil Procedure 60 and the failure of the Plaintiff to previously request an extension to file a response to the Defendant's Motion. *See* Memorandum Order dated September 29, 2004 (Document No. 39 at C.A. No.1994–23J). Thus, this Court ruled that this matter would be considered based upon the record restricted to the Defendant's Motion and Plaintiff's Motion to Take Discovery (Document Nos. 32 and 37) and the exhibits attached thereto along with the oral argument conducted on October 8, 2004.

A copy of the signed Release is attached to the Defendant's Motion as Exhibit "A". The Release is entitled *"GENERAL RELEASE AND SETTLEMENT"* and names Plaintiff Frye along with identifying his address and thereafter refers to Consolidated Rail Corporation, along with other railroad carriers. Within the Release is the stated consideration of $5,000.00, and it is signed and dated October 2, 2002. The Release further references Plaintiff Frye's

Complaint, his deposition of July 20, 1994 and the expert reports of Drs. Shane, Wilson, Blaisdell, Begley and Perovich as found in "C.A. No. 94–23J (U.S.Dist.Ct., W.D.Pa.)," the docket number for this civil action. The Release further describes the injuries for which it is being offered:

> ... relating to any known injuries, symptoms, illnesses, diseases or risks that are in any way connected to (1) the inhalation, ingestion or exposure, occurring prior to the execution of this Release, of any material substance, product and or goods of any kind or nature (including but not limited to dust, fumes, vapors, mists, gases, liquids, solids, wastes, agents, toxic substances or chemicals of any kind) supplied, used discharged, releases or permitted to exist by Conrail, and/or (2) any working condition existing prior to the execution of the Release.

Motion to Enforce Release, Exhibit A. In the next paragraph of the Release, it reads:

> I acknowledge that I am at risk of developing other conditions, injuries or diseases in the future, including heart and pulmonary diseases and conditions or diseases that include the symptoms of memory loss (or impairment), difficulty concentrating, fatigue, headaches and/or irritability, and that this Release covers all such conditions, injuries or diseases that may be attributable to exposures or working conditions occurring prior to execution of the Release, provided that this Release does not cover cancer or carpal tunnel syndrome.

*Id.* The Plaintiff cashed the two checks provided to him for the settlement of three claims: the current civil action ($5,000.00); his claim for repetitive stress ($120,000.00); and his claim for carpel tunnel syndrome ($50,000.00). Defendant's Motion to Enforce Release, Exhibit B.

A review of this Release reveals that Plaintiff Frye does not have an issue similar to that found in *Wicker, et al. v. Consolidated Rail Corporation,* 142 F.3d 690 (3rd Cir.1998). In that case, Judge Becker, writing for the Third Circuit, concluded that the releases at issue were invalid based upon the failure of the evidence to demonstrate that the plaintiffs had an awareness of the "scope of the claims being waived." *Wicker* at 701. As explained by Judge Becker, "Consequently, the releases do not demonstrate the employees knew of the actual risks to which they were exposed and from which the employer was being released." *Wicker* at 701. That issue is not present in the case *sub judice.* The Release signed by Plaintiff Frye explicitly refers to the docket number of the civil action being released and compromised. Further, it references the expert opinions that concern Plaintiff Frye's claims by naming such experts and the dates of their expert reports as well as the Plaintiff's deposition, all of which are dated years before the signing of the Release.

By the time of the signing of the Release in 2002, the Plaintiff was aware of what his claims were and it is clear that he was also aware of his trial strategy which is made evident by the act of retaining of expert witnesses. Therefore, the absence of the naming of a specific malady within the Release is overcome by the specific references to this case's docket number, the Plaintiff's deposition and the Plaintiff's experts' reports which are of record in this matter and clearly available to both parties, particularly the Plaintiff, through his attorney. In addition, the Plaintiff, having been deposed in this matter, and such deposition being referenced in the Release in question clearly establishes that the Plaintiff was aware of the claims he was releasing by his signature. Therefore, the

Court finds that the Release is not violative of § 5 of the FELA, 45 U.S.C. § 55.

To address the oral argument of Plaintiff's counsel that Conrail should not be permitted to send the Release for the case *sub judice* to the Plaintiff's additional counsel (who represented Plaintiff Frye on unrelated matters) and have that counsel's signature be operative, and therefore these actions somehow negate the effectiveness of the release, the Court disagrees. The Plaintiff either read the Release or did not read the Release; however, the Plaintiff did sign the Release which clearly referred to the docket number in this matter. Furthermore, Plaintiff's additional counsel signed the Release; if the Plaintiffs' additional counsel read the Release and signed the document rather than forwarding it to or conferring with Plaintiff's former counsel, such actions may raise ethical concerns. However, even if both the additional counsel and the Plaintiff did not read the Release, the Court will not void the Release for their failure to read a document that required their signatures. The Release is clear and unambiguous in its language, and it makes reference to the docket number and the Plaintiff's experts in the case *sub judice*. The evidence does not demonstrate an intentional act by the Defendant to deceive the Plaintiff's former counsel. In addition, the Plaintiff signed the Release, which was consistent with the advice of his former counsel. The Court recognizes that it can be argued that the evidence could demonstrate that the Defendant made a mistake in misaddressing the Release just as it is possible that the Plaintiff's additional counsel made a mistake in signing the Release. However, under any of the plausible circumstances explaining the execution of this release,

Plaintiff Frye has no support for its invalidation by this Court. The Plaintiff's second argument is that the Plaintiff was induced to sign the Release upon the advice of his then-attorney, advice that was presumably based to some extent upon an evaluation of two of Dr. Albers' studies: Albers, JW, *et al.*, *Absence of Polyneuropathy Among Workers Previously Diagnosed with Solvent–Induced Toxic Encephalopathy*, JOEM, Volume 41(6) pp. 500–509 (June 1999); Albers, JW, *et al.*, *Neurologic Evaluation of Workers Previously Diagnosed With Solvent–Induced Toxic Encephalopathy*, JOEM, Volume 42(4) pp. 410–423 (April 2000). The Plaintiff's current counsel alleges that these studies were fabricated for the benefit of the joint defense agreement among several railroads and were also conducted using privileged medical information of the similarly situated railroad workers who submitted to medical exams in their respective FELA civil actions.

No evidence of the alleged fabrication has been brought before the Court, although this Court notes that the Plaintiff's request for discovery on this point was denied in its order of September 24, 2004.[18] The Plaintiffs requested a period of discovery to prove the "fabrication" of Dr. Albers' studies, but offered no factual basis for any suspicion that the studies were fabricated in any way by the members of the railroad joint defense agreement, other than pure speculation based upon the fact that CSX Corporation and Dow Chemical Company funded in part the two studies in question. These allegations appear to the Court as being far removed from any basis upon which to conclude that Dr. Albers was paid to fabricate the studies used by the Defendant.

---

**18.** The Court notes that discovery had been completed for more than seven years at the time of this late request by Plaintiff.

Dr. Albers previously testified in a unrelated civil action that the decision to apply for governmental and private funding to begin a reporting of the medical exams previously conducted of railroad workers, in particular those workers engaged in litigation, was an idea settled upon by him and a group of other doctors conducting such medical examinations. Plaintiff's Motion to Take Discovery, Exhibit 10, pp. 44–45. Dr Albers and his partner, Dr. Berent, thereafter applied for funding to study the results of the medical exams from CSX Corporation. *Id.* Therefore, the Court finds no "fabrication" of scientific studies to be present in Dr. Albers' studies because of the fact that the data relied upon was already within his possession from the medical exams he conducted and the decision to study the data and apply for funding for such a study was his decision and not that of CSX Corporation. However, the decision to utilize the data obtained from the medical exams conducted by Dr. Albers and other doctors leads the Court to the Plaintiff's second issue.

Plaintiff Frye contends that the two published studies of Dr. Albers were illegal based upon the fact that the privileged medical information of similarly situated railroad workers was used without their consent. It is the contention of the Plaintiff that in reliance upon these two studies his former counsel believed that settlement was in the Plaintiff's best interest and advised him to settle. Based upon these circumstances, the Plaintiff argues that a fraud occurred under Pennsylvania law with regard to the Plaintiff's execution of the Release as it was signed in reliance on the illegal studies. Plaintiff relies upon Pennsylvania law of fraud to support his argument. Plaintiff's Memorandum of Law in Support of Motion to Take Discovery, pp. 2–3. In addition, the Plaintiff argues that enforcement of the Release would violate public policy because the Release was obtained by fraud.

It has long been held that only federal law, not state law, is determinative in matters concerning the validity of releases under FELA. *See e.g., Dice v. Akron, Canton & Youngstown R.R. Co.,* 342 U.S. 359, 72 S.Ct. 312, 96 L.Ed. 398 (1952). *Maynard v. Durham & S. Ry. Co.* 365 U.S. 160, 81 S.Ct. 561, 5 L.Ed.2d 486 (1961). "One who attacks a settlement must bear the burden of showing that the contract he has made is tainted with invalidity, either by fraud practiced upon him or by a mutual mistake under which both parties acted." *Callen v. Pennsylvania R.R. Co.,* 332 U.S. 625, 630, 68 S.Ct. 296, 298, 92 L.Ed. 242, 246 (1948). The Plaintiff alleges a form of fraud in the inducement to the extent that an alleged misrepresentation by a Defendant's expert in unrelated, but relevant, scientific studies influenced former Plaintiff's counsel and the Plaintiff to enter into a release.

The Court finds the following as facts for the purpose of this second argument of the motion: 1) The two studies upon which the former Plaintiff's counsel relied were studies that were authored in part by Dr. Albers, who is a retained expert for the Defendant in this matter; 2) The two studies were published in June 1999 and April 2000; 3) the defects in the accumulation of the human subject's medical information used in Dr. Albers' studies were cured by the University of Michigan and noted in the correspondence previously discussed in Section I of this Memorandum Opinion and found at Exhibit 7 to Conrail's Response (Document No. 79 at C.A. No.1994–4J); 4) The Plaintiff signed the release on October 2, 2002; 5) The two studies did not rely upon medical information from the Plaintiff; and 6) Plaintiff's former counsel had retained experts on behalf of the Plaintiff including Dr. Wilson and Dr. Shane.

In addition, former Plaintiffs' counsel Richard Stevens states the following in an April 2, 2004 letter to current Plaintiffs' counsel, George Chada:

Dear George:

In regards to the various Conrail Litigation which we were involved in, the reports of Dr. James W. Alberes [sic] and Dr. Stanley Berent was the but for cause regarding our advice to all of our clients that it would be unlikely that they would prevail and thus should accept whatever offer the railroad was making. These reports were what compelled the various settlements at issue in this matter. If not for these reports, we never would have advised our clients to settle this matter.

Plaintiffs' Motion to Take Discovery, Exhibit 14.[19]

Most of the relevant precedent on fraud surrounding settlements and releases under the FELA concerns the releasor's knowledge of his/her injuries and their seriousness or whether the releasor was aware that the document signed was in fact a release. However, the case *sub judice* presents a unique issue in that the Plaintiff is arguing that the advice to settle given by former Plaintiff's counsel was somehow induced and tainted by the fact that the former counsel relied upon scientific studies conducted by the Defendant's experts independent of the case *sub judice*, but which were supportive of the Defendant's defense.

The case which most directly provides the Court guidance on this matter is that of *Wagoun v. Chicago, Burlington & Quincy R.R.*, 155 Neb. 132, 50 N.W.2d 810 (1952). In that case, the Plaintiff argued that her settlement with the defendant railroad should not be honored for the fact that, *inter alia*, it was obtained by fraud, specifically a conspiracy between her counsel and the Defendant in order to obtain the Plaintiff's settlement of the matter. *Wagoun* at 133–134, 50 N.W.2d 810. The Plaintiff argued that in furtherance of the conspiracy her counsel sought employment by her and misrepresented to her that she would be able to return to her previous work with the Defendant with full seniority rights in addition to $3,000.00 as consideration for settlement of her claim. *Id.* The settlement instrument was not read by the Plaintiff, but read to her by her counsel. *Id.* The Supreme Court of Nebraska concluded that the facts did not demonstrate that the plaintiff's counsel was an agent of the Defendant. *Wagoun* at 139, 50 N.W.2d 810. Therefore, plaintiff's counsel's representations and statements as to the plaintiff's return to her employment with retention of seniority rights could not be attributed to the defendant so as to form a legal basis to void the release of the defendant. *Wagoun* at 139–140, 50 N.W.2d 810.

The case *sub judice* presents an issue which is similar but not on point with the *Wagoun* case. Accepting Plaintiff's former counsel Mr. Stevens' representation to current Plaintiff's counsel that the two Albers' studies were the *sine qua non* of his decision to advise the Plaintiff to settle his case, among others, practically erects a barrier to the Plaintiff's causation argument. That argument traces Mr. Stevens' decision to advise settlement rather than proceeding to trial to confront the medical studies conducted by Dr. Albers. The Plaintiff argues that these studies are illegal and have been fabricated. However,

---

**19.** The Court agrees with the Defendant's footnote two in its Response to Plaintiff's Motion to Reopen Discovery (Document No. 38 at C.A. No. 94–23J) that although Mr. Stevens' letter refers to Dr. Albers "reports", it was intended to refer to his studies at issue and not his expert reports in the case *sub judice*.

whatever the nature of the studies, Mr. Stevens and his law firm chose to heed them and not investigate them or attempt to locate further evidence contrary to the conclusions of the studies.

The true reason why these studies influenced Mr. Stevens' advice will be left to speculation, but it was his advice to the Plaintiff to settle. Such advice was separate and apart from any coercion or direction from the Defendant. Mr. Stevens was not required to accept the conclusions of the studies of Dr. Albers, but could have advised Plaintiff Frye to continue onto trial in light of them and still mount a case against the Defendant. Nowhere does it appear in the record that the settlement was part of a conspiracy on the part of the Defendant and Mr. Stevens; it does not appear that Mr. Stevens was prevented from investigating further into the background behind Dr. Albers' studies and their alleged illegality; and it does not appear that Mr. Stevens was prevented from hiring his own experts to investigate and confirm the findings of the Albers' studies.

It is the Court's conclusion that Mr. Stevens and his law firm made the decision to advise settlement of Frye's civil action against the Defendant. Such advice was based upon a legal evaluation and decision by an attorney and counselor-at-law. The Court feels it has no place to second guess the decisions of the practitioners that come before it, especially in the area of settlements. It appears clear that Plaintiff Frye's current counsel would have not advised settlement, but rather would have pursued the basis of Dr. Albers' research prior to giving any advice to the Plaintiff.

In any event, Mr. Stevens and his firm made a legal evaluation as practitioners and concluded that settlement was in their client's best interest. The fact that it appears to be an incorrect decision to current

Plaintiff's counsel or that information obtained after the settlement revealed that the studies relied upon in the practitioners' evaluation of the settlement are allegedly illegal, but not shown to be scientifically unreliable, does not equate to fraud on the part of the Defendant. Similar to the circumstances in *Wagoun* where the actions of counsel could not be attributed to the defendant, Mr. Stevens' evaluation of the settlement offer and the strength of the Plaintiff's case was independent of any of the Defendant's actions. On this basis, the Defendant's Motion to Enforce Release is granted.

## IV. MOTIONS FOR SUMMARY JUDGMENT

The Plaintiffs have filed an "Opposition to Summary Judgment" (Document No. 122 at C.A. No. 93–41J) opposing entry of summary judgment in favor of the Defendant. Although the Defendant has not filed a motion for summary judgment, it attached a proposed order for summary judgment in all of the cases *sub judice* to its Post–Hearing Proposed Findings of Fact and Conclusions of Law (Document No. 68 at C.A. No.1994–4J). The Court at this juncture denies any request for summary judgment without prejudice. A separate scheduling order will follow the entry of the attached order and will set forth deadlines for summary judgment motions and pretrial statements.

## V. RECONSIDERATION OF PLAINTIFFS' MOTION TO SUPPLEMENT PLAINTIFFS' RESPONSE

The Plaintiffs filed a motion on August 13, 2004 entitled Plaintiffs' Motion Pursuant to Rules 26(a), 26(2)(A)(1) & 702 Federal Rules of Civil Procedure to Request A Hearing to Supplement Plaintiffs' Response to Defendant's Motion *in Limine* to Preclude Scientific Evidence (Docu-

ment No. 105 at C.A. No.1993–41J). The Court issued an order (Document No. 107 at C.A.No.1993–41J) dated August 23, 2004 stating that the Plaintiffs' Motion was denied pending the October 8, 2004 oral argument on the pending Motion *in Limine* and Motion to Enforce Release that are decided by this opinion and order. The Plaintiffs' motion essentially requested permission to present Dr. Joseph C. Wu, M.D. for the taking of his testimony as to the applicability of Positron Emission Tomography (PET). PET is a medical analysis that some of the Plaintiffs have undergone and is argued by them to demonstrate objective evidence of their toxic solvent encephalopathy.

The Court, by means of an order dated September 29, 2004 (Document No. 114 at C.A.No.1993–41J) granted permission to Plaintiffs Lang, Keagy and Frye to argue evidence concerning PET during the October 8, 2004 argument, as they were the only Plaintiffs at the time to have undergone PET. It was further ordered that no testimony would be taken on October 8th, only that argument would occur upon evidence previously produced, included in which were the three PET exams of Plaintiffs Lang, Keagy and Frye. Although these three PET evaluations were permitted to be conducted by Judge Fullam long after the completion of fact and expert discovery in this matter, the Plaintiffs subsequently withdrew these PET evaluations from consideration "until such time as the Court identifies any evidentiary issues related thereto." Plaintiffs' Reply to Defendant's Supplement to Conrail's Motion *in Limine* (Document No. 120 at C.A. no. 1993–41J), ¶ 14. This reply was filed on October 8, 2004, the date of the Motion *in Limine* argument. It is clearly not within the Court's realm to identify any issues with regard to the Plaintiffs' evidence; those issues are for the Defendant to identify and challenge as it did in its Motion *in*

*Limine*. The Court was willing to hear argument concerning the PET evaluations of the three Plaintiffs, but their counsel withdrew these evaluations from evidence and did not address them at the time of the argument on the Motion *in Limine*. The following exchange occurred at argument on October 8, 2004:

> **Mr. Houghton**: Your Honor, I still have, of course, Dr. Scott and Dr. Morrow and Dr. Wu.

> **Mr. Chada**: Your Honor, I withdraw Dr. Wu from consideration. Unless there is a fully articulated Daubert issue as to Dr. Wu, I withdraw all of the Positron Emission Tomography.

> **Mr. Houghton**: His unless and maybe and perhaps. Dr. Wu has been disqualified wherever he's come up, he knows it because he couldn't do it in Philadelphia and he can't do it here. So I'm ready—

> **The Court**: He wasn't part of the—

> **Mr. Chada**: '97.

> **The Court**:—Daubert hearing, was he?

> **Mr. Houghton**: He was not.

> **The Court**: Okay. Unless Mr. Chada is going to offer something—

> **Mr. Chada**: I tried to offer him—

> **The Court**: Please don't interrupt. I think I understand ... you offered to bring them to this argument, and now you're saying you're not going to do that. So as far as the Court is concerned, Dr. Wu is not an issue today.

> **Mr. Chada**: Thank you, Your Honor.

AT, pp. 135–136. (Document No. 84 at C.A.No.1994–4J).

Therefore, upon *sua sponte* review of the Plaintiffs' Motion to Supplement Plaintiffs' Response with the testimony of Dr. Joseph C. Wu, found at Document Number 105 at Civil Action Number 1993–41J, that motion is denied because the time for

fact and expert discovery has long since passed in this action and any remaining evidence of PET evaluations of record in this matter has been withdrawn by the Plaintiffs at the October 8, 2004 argument proceeding.

An appropriate order follows.

**AND NOW,** this 24th day of March, 2005, upon consideration of the pending motions under review and in accordance with the foregoing Memorandum Opinion, IT IS HEREBY ORDERED THAT:

1) The Plaintiffs' Motion to Strike Conrail Motion *in Limine,* Document No. 119 at Civil Action No.1993–41J is DENIED;

2) The Defendant's Motion *in Limine,* Document No. 24 at Civil Action 1994–4J is DENIED IN PART and GRANTED IN PART as follows:

a) The opinions and evidence presented by **Michael J. Ellenbecker, Sc.D.** and **George M. Perovich, Ed.D.** are excluded and cannot be used at the time of trial;

b) **Melvyn J. Kopstein, Ph.D.,** is qualified to opine as to chemical engineering but not as to causation of the Plaintiffs' medical conditions and illnesses; his opinions as to plain observations/conclusions are excluded and his opinions based upon the Unsteady State Diffusion Model and the calculation of the amount of waste spread by the "slop truck" are found reliable and fit under F.R.E. 702 and therefore can be used at the time of trial;

c) **David O. Wilson, M.D.** is qualified as an expert on occupational disease, including pulmonary diseases and internal medicine, however, his opinions are found unreliable under F.R.E. 702 and therefore his opin-

ions cannot be used at the time of trial;

d) **Lisa Morrow, Ph.D.,** is unqualified as an expert and her opinions are unreliable under F.R.E. 702 and cannot be used at trial because of the lack of evidence of record demonstrating her qualifications as an expert and the reliability of her opinions;

e) **John J. Shane, M.D.,** is a qualified expert on pathologic anatomy and chemical pathology (which includes certifications in chemistry and toxicology) and his opinions are reliable and fit and can be used at the time of trial and it is also ordered that the Defendant's challenge to Dr. Shane's testimony based upon the lack of epidemiological evidence demonstrating a higher rate of incidence than the general population is DENIED WITHOUT PREJUDICE to the Defendant to reargue this matter in a summary judgment motion and the Defendant's challenge to Dr. Shane's testimony as to F.R.E. 403 is DENIED;

f) **Allene J. Scott, M.D.,** is qualified as an expert on occupational medicine and is qualified as an expert on the subject of differential diagnosis and her opinions are reliable and fit under F.R.E. 702 and can be used at the time of trial;

g) **Michael LeWitt, M.D.,** is qualified as an expert in the field of medicine generally and on the subject of differential diagnosis, but his opinions are excluded for lack of a factual foundation as required under F.R.E. 702 and his opinions cannot be used at the time of trial;

h) All experts whose opinions have been found to be admissible for trial under F.R.E. 702 are admissi-

ble as to their reports currently on record with the Court and the parties are directed that no further expert pleadings or evidence shall be filed or will be considered by the Court as the time for expert discovery has already concluded;

3) The Defendant's Motion to Enforce Release, Document Number 32 at Civil Action Number 1994–23J is GRANTED and counsel for Terry L. Frye is directed to sign any stipulation of dismissal provided to him by the Defendant's counsel and to be filed with the Court, and the Clerk of Court is directed to mark this case closed pending the receipt of such stipulation;

4) Any pleading considered to be a Motion for Summary Judgment filed by any of the parties is DENIED without prejudice and a separate scheduling order will issue directing the deadlines for the filing of the parties' pre-trial statements and motions for summary judgment; and

5) Upon *sua sponte* reconsideration of the Plaintiffs' Motion Pursuant to Rules 26(a), 26(2)(A)(1) & 702 Federal Rules of Civil Procedure to Request A Hearing to Supplement Plaintiffs' Response to Defendant's Motion *in Limine* to Preclude Scientific Evidence Document Number 105 at Civil Action Number 1993–41J, said Motion is DENIED.